# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TENNESSEE
# WESTERN DIVISION

| | |
|---|---|
| AMERICAN SPIRIT AND CHEER ESSENTIALS, INC. by HEIDI WEBER,  ROCKSTAR CHAMPIONSHIPS, LLC by DAVID OWENS, JEFF & CRAIG CHEER, LLC, d/b/a JEFF AND CRAIG CAMPS, by CRAIG HALLMARK, MARK LUKENS and KATHLEEN LUKENS, and ASHLEY HAYGOOD, Individually and on Behalf of all Others Similarly Situated, | CIVIL ACTION FILE NUMBER:  2:20-CV-02782-SHL-tmp |
| Plaintiffs, | **CLASS ACTION FIRST AMENDED COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| VARSITY BRANDS, LLC, BSN SPORTS, LLC, VARSITY SPIRIT LLC, HERFF JONES, LLC, VARSITY BRANDS HOLDING CO., INC., VARSITY SPIRIT FASHION & SUPPLIES, LLC, U.S. ALL STAR FEDERATION, INC., USA FEDERATION FOR SPORT CHEERING, d/b/a USA CHEER, VARSITY INTROPA TOURS, LLC and JEFF WEBB, | |
| Defendants. | |

# TABLE OF CONTENTS

I.      SUMMARY ................................................................. 1

II.    JURISDICTION AND VENUE ............................................. 2

    A.    Subject Matter Jurisdiction ............................................. 2

    B.    *In Personam* Jurisdiction ............................................... 3

    C.    Venue ..................................................................... 4

III.   PARTIES ................................................................... 5

IV.   BACKGROUND STORY ................................................. 15

    A.    History of the Varsity Monopoly Enterprise .............. 15

        1.    The Competition Cheerleading Monopoly ......... 45

            a.    Varsity Control Over the Competition Cheerleading and Scholastic Governing Boards .......................................................... 54

                i.    Competition Cheerleading Governing Board ............................... 55

                ii.   Competition Scholastic Governing Board ............................................. 65

        2.    Competition All Star Apparel ........................... 76

    B.    Markets Under Varsity's Control ............................... 79

        1.    The Cheer Competition Market ........................ 80

        2.    The College, High School, Recreational and Junior High School Cheer Market ......................................... 81

3. The College, High School, and Junior High School Athletic Equipment Market.................................83

4. The College, High School, and Junior High School Graduation Regalia Market..........86

5. The Cheer Camp Market....................................87

C. How Varsity Monopolizes.............................89

D. Scope of Varsity's Monopoly Power..........................104

1. Monopolistic Market Shares............................104

2. Period of Control................................105

3. Varsity's Exclusionary Practices Tending Towards Monopoly..........................106

4. Harm to Plaintiffs............................108

V. INTERSTATE TRADE AND COMMERCE....................110

VI. CLAIMS....................................111

A. Creating Illegal Restraints of Trade in Violation of 15 U.S.C. § 1.........................114

B. Monopoly Making in Violation of 15 U.S.C. § 2.................................114

C. Making of Agreements Not to Use the Goods of Competitors in Violation of 15 U.S.C. § 14..........................114

VII. CLASS ALLEGATIONS....................................116

VIII. JURY TRIAL DEMANDED.............................126

ii

IX.      PRAYER ................................................................................ 126

**We are not filing this lawsuit to be right....**

**We are filing this lawsuit to get it right.**

## I.      SUMMARY

1.      This is a simple case.  Plaintiffs allege that Defendants conspired individually and/or collectively to sell commodities and services at fixed prices within the United States on the condition that the purchasers would refrain from and/or not use U.S. competitors' commodities or services.  They turned the market into a loyal captive market through their enterprise of conspiracy to monopolize.  Doing so substantially lessened competition in the flow of interstate commerce. More specifically, doing so substantially lessened competition in the U.S. markets for (1) cheer competitions; (2) recreational and scholastic field and sideline cheer; (3) recreational and scholastic athletic equipment; (4) scholastic graduation regalia; and (5) cheer camps in violation of 15 U.S.C § 14.  Similarly, doing so tended to create monopolies in those markets.  With that monopolistic control,

1

Defendants could and did exact elevated prices from those markets. As a result, and as bolstered by the example contained in the affidavit(s) attached to Plaintiffs original Complaint (ECF No. 1), people suffered. Indeed, competing suppliers suffered blocks to market access and reduced earnings while scholastic groups and parents suffered reduced buying options and higher commodity prices. Moreover, the scope and duration of the monopolistic enterprise alleged below shows a clear and present danger of continuing future monopolistic activity and fraud. For these damages, the Plaintiffs and others similarly situated (the "Proposed Classes") are due just compensation.

## II.   JURISDICTION AND VENUE

### A.   Subject Matter Jurisdiction

2.   This Court has jurisdiction over the subject matter of this action pursuant to:

(1)   the Clayton Act, 15 U.S.C. §§ 15 and 26; and

(2)   the Sherman Act, 15 U.S.C. §§ 1, 2, and 4.

2

Indeed, Plaintiffs and their Proposed Classes bring this action against Defendants under, *inter alia*, Sections 4 and 16 of the Clayton Act—15 U.S.C. §§ 15(a) and 26—seeking equitable and injunctive relief and actual and exemplary damages against Varsity for violating 15 U.S.C. § 14.

**B.   *In Personam* Jurisdiction**

3.      This Court has *in personam* jurisdiction over Defendants because they, either directly or through the ownership and/or control of their subsidiaries, *inter alia*:

(1)    transacted business in the United States, including in this District, by selling their products and services in Georgia, Tennessee, Oklahoma, North Carolina and all states in the United States of America and by holding one of the largest competitive cheer competitions each year in Atlanta, Georgia called "CheerSport";

(2)    directly sold or marketed goods and services throughout the United States, including in this District;

3

(3) had substantial aggregate contacts within the United States, including in this District;

(4) engaged in an illegal enterprise and conspiracy scheme to maintain and enhance monopoly power that was directed at, and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District; and

(5) caused direct, substantial, reasonably foreseeable, and intended anticompetitive effects upon interstate commerce within the United States, including in this District.

(6) Possessed monopoly power coupled with the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of having a superior product, business acumen, or historic accident.

**C.    Venue**

4

Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 (b), (c), and (d) as well as 15 U.S.C. §§ 15(a) and 22.  That is because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and Defendants are licensed to do business in, are doing business in, had agents in, are found in, or transact business in this District.

### III.   PARTIES

4.    Plaintiff Heidi Weber represents herself as a class representative and as an officer of American Spirit and Cheer Essentials, Inc. which is an apparel company that designs, manufactures, and sells competitive and high school uniforms and apparel, including during the Class Period (defined below).  Plaintiff is incorporated in the state of Oklahoma with its primary place of business in Tulsa, Oklahoma. Plaintiff has been curtailed from selling goods in a competitive market, including this District, due to the actions of the

5

Defendants and has thus suffered economic harm and damages. Heidi Weber is the principal owner and officer of American Spirit and Cheer Essentials, Inc. and her company can adequately represent the interests of the class of apparel companies in this lawsuit.

5.     Plaintiff David Owens represents himself as a class representative and Rockstar Championships, LLC which is an independent competition producer of cheerleading competitions during the Class Period. Plaintiff Rockstar Championships, LLC is incorporated in the state of Oklahoma with its primary place of business in Oklahoma City, Oklahoma.  Plaintiff has been curtailed from selling services in a competitive market, including this District, due to the actions of the Defendants and has thus suffered economic harm and damages.  David Owens is the principal owner and an officer of Rockstar Championships, LLC and can adequately represent the interests of the class of independent event producer companies in this lawsuit.

6.     Plaintiff Craig Hallmark represents himself as a class representative, and Jeff & Craig Cheer, LLC, d/b/a Jeff and Craig

6

Camps which is an independent producer of scholastic and competitive cheer camps during the Class Period. Plaintiff Jeff & Craig Cheer, LLC, d/b/a Jeff and Craig Camps is incorporated in the state of Oklahoma with its primary place of business in Oklahoma City, Oklahoma. Plaintiff has been curtailed from selling services in a competitive market, including this District, due to the actions of the Defendants and has thus suffered economic harm and damages.  Craig Hallmark is the principal owner and an officer of Jeff & Craig Cheer, LLC, d/b/a Jeff and Craig Camps and can adequately represent the interests of the class of independent event producer companies in this lawsuit.

Plaintiff Ashley Haygood is a natural person and resident of the state of Georgia, residing in the Northern District of Georgia.   Ms. Haygood, as the parent of a school child, paid competition entry fees, competition admission fees, purchased cheerleading insurance, purchased both competitive and scholastic cheerleading uniforms, paid membership fees to USASF, purchased a High School graduation cap and gown, graduation announcements, graduation tassel,  paid for hotel

7

rooms in the Varsity "Stay to Play" program, purchased competition warm up uniforms, purchased Varsity spirit wear for "Summit" competition gear and shirts, purchased sneakers, purchased backpacks and other cheerleading merchandise, and purchases through "Travel Source", and would be obligated to pay for cheerleading camps marketed by Varsity during the Class Period. Her son played football for Woodstock Middle School using athletic equipment, helmet, football uniform and football cleats purchased from Varsity. She paid an enhanced and inflated purchase price for these goods, all of which were paid to the Defendants, directly or indirectly, and has thus suffered economic harm and damages as a direct and proximate result of Defendants' unlawful conduct.

7.     Mark and Kathleen Lukens are natural persons and residents of the state of North Carolina. The Lukens, as the parents of a school child, paid competition entry fees, competition admission fees, purchased travel accommodations known as "Stay to Play" by Varsity, paid for Varsity camps and insurance, purchased both competitive and

scholastic cheerleading uniforms and warm ups, purchased pom poms for scholastic cheer, purchased sneakers, purchased backpacks and other cheerleading merchandise, paid membership fees to USASF, and were obligated to pay for cheerleading camps marketed by Varsity during the Class Period of July 20, 2016 to July 20, 2020 and purchased a cap & gown along with graduation announcements during that same time period.  They paid an enhanced and inflated purchase price for these goods, all of which were paid to the Defendants, directly or indirectly, and has thus suffered economic harm and damages as a direct and proximate result of Defendants' unlawful conduct.

8.  *Defendant Varsity Brands*, formerly known as Varsity Brands, Inc., is a Delaware corporation with its principal place of business in Memphis, Tennessee. It is the parent company of Defendants Varsity Spirit, LLC, BSN Sports, LLC, Herff Jones, LLC, Varsity Intropa Tours, LLC, and Stanbury, LLC.  Varsity Brands, directly and/or through its affiliates, which it wholly owned and/or controlled, manufactured, distributed, advertised, and/or sold

9

competition, junior high school, high school, recreation, and/or college goods and services, including:

    (a)    athletic and cheerleading uniforms, shoes and merchandise;

    (b)    team athletic gear;

    (c)    marching band and color guard uniforms and shoes;

    (d)    class rings;

    (e)    yearbooks;

    (f)    caps, gowns and tassels; and

    (g)    school image branding and construction

throughout the United States, including in this District, at all times relevant to this Complaint.

9.    *Defendant Varsity Spirit, LLC*, formerly known as Varsity Spirit Corp., is a Tennessee corporation with its principal place of business in Memphis, Tennessee.  It is listed with the Georgia Secretary of State as doing business in the state of Georgia. Varsity Spirit, directly and/or through its affiliates, which it wholly owned and/or controlled, manufactured, distributed, advertised, and/or sold all things in cheer

10

competition, junior high school, high school, and/or college goods and services throughout the United States, including in this District, at all times relevant to this Complaint.

10. *Defendant BSN Sports, LLC*, formerly known as BSN Sports, Inc., is a Delaware corporation with its principal place of business in Farmers Branch, Texas. BSN Sports, directly and/or through its affiliates, which it wholly owned and/or controlled, manufactured, distributed, advertised, and/or sold junior high school, high school and college team athletic equipment and uniforms [baseball, football, basketball, lacrosse, soccer, track, softball, wrestling, cheerleading, and volleyball] throughout the United States, including in this District, at all times relevant to this Complaint.

11. *Defendant Herff Jones, LLC*, formerly known as Herff Jones, Inc., is an Indiana corporation with its principal place of business in Indianapolis, Indiana. Herff Jones, directly and/or through its affiliates, which it wholly owned and/or controlled, manufactured, distributed, advertised, and/or sold graduation announcements, high school

11

yearbooks, diplomas, class and championship rings, caps, gowns, and tassels throughout the United States, including in this District, at all times relevant to this Complaint.

12.  *Defendant Varsity Brands Holding Co., Inc.* is a U.S. holding company, which owns individually and/or collectively several of the Defendant companies named herein above. Defendant Varsity Brands Holding Co., Inc. directly and/or through its affiliates, which it wholly owned and/or controlled, engaged in the market activity of each Defendant defined above throughout the United States, including in this District, at all times relevant to this Complaint.

13.  *Defendant Varsity Spirit Fashion & Supplies, LLC* is a Minnesota corporation with its principal place of business in Memphis, Tennessee. Varsity Spirit Fashion & Supplies, directly and/or through its affiliates, which it wholly owned and/or controlled, manufactured, distributed, advertised, and/or sold All Star, Recreational, Junior High School, High School and College Apparel throughout the United States, including in this District, at all times relevant to this Complaint.

12

14.     *Defendant Varsity Intropa Tours, LLC* is a Tennessee corporation with its principal place of business in Memphis, Tennessee. Varsity Intropa Tours, LLC, directly and/or through its affiliates, which it wholly owned and/or controlled, manufactured, distributed, advertised, and/or sold travel packages throughout the United States, including in this District, at all times relevant to this Complaint.

15.     *Defendant USASF (United States All Star Federation)* is a Tennessee non-profit corporation with its principal place of business in Memphis, Tennessee.  USASF, directly and/or through its affiliates, which it wholly owned and/or controlled, promulgated and/or enforced rules governing All Star Competitions and, more broadly, the sport of All Star cheer and dance throughout the United States, including in this District, at all times relevant to this Complaint.  Moreover, USASF, directly and/or through its affiliates, which it wholly owned and/or controlled, organized, promoted, and/or managed All Star Competitions throughout the United States, including in this District, at all times relevant to this Complaint.

13

16.    *Defendant USA Federation for Sport Cheering, d/b/a USA Cheer,* is a non-profit corporation with its principal place of business in Memphis, Tennessee.  USA Cheer, directly and/or through its affiliates, which it wholly owned and/or controlled, promulgated and/or enforced rules governing All Star and scholastic competitions and, more broadly, the sport of ALL Star cheer and scholastic cheer throughout the United States, including in this District, at all times relevant to this Complaint. Moreover, USA Cheer, directly and/or through its affiliates, which it wholly owned and/or controlled, organized, promoted, and/or managed All Star and scholastic competitions throughout the United States, including in this District, at all times relevant to this Complaint.

17.    *Defendant Jeff Webb* is a natural person residing in Memphis, Tennessee with an office located at the Varsity headquarters, 6745 Lenox Center Court, Suite 300, Memphis, Tennessee 38115.  Jeff Webb, as an officer and CEO of Varsity was both actively and knowingly engaged in Varsity's anticompetitive schemes throughout the United States, and he directly and/or through the above-named Defendants,

14

conspired for many years and engaged in the nationwide market activity of most of the Defendants defined above throughout the United States, including in this District, at all times relevant to this Complaint.

18. The above-named defendants agreed and cooperated to employ the monopolistic enterprise as described below. Consequently, the term "Varsity" shall hereinafter refer to Defendants, individually and/or collectively acting in conspiracy to effectuate the illegal monopolistic enterprise described below.

## IV.    BACKGROUND STORY

### A.    History of the Varsity Monopoly Enterprise

19. The following is a highlight of relevant history demonstrating the growth and entrenchment of Varsity's monopolistic enterprise:

20. Lawrence Herkimer, founded the National Cheerleaders Association ("NCA") in 1948.

15

21.     Defendant Jeff Webb, Varsity's founder and former CEO, went to work at the NCA after completing his cheerleading career at the University of Oklahoma in the late 1960's.

22.     In 1974, Webb left NCA to form his own cheerleading business, the Universal Cheerleaders Association ("UCA"), which was similar to the NCA (National Cheerleading Association) but with Webb's own added twists: more focus on gymnastics-like skills and new competitions created solely for cheer squads.

23.     In 1980, Jeff Webb and Kris Shepard create UDA, the Universal Dance Association.

24.     In 1987, the American Association of Cheerleading Coaches and Advisors (AACCA) is founded as the safety certifying group for the cheerleading industry.   Shortly thereafter, Varsity applies for trademark ownership of AACCA.

25.     In 1989, Varsity acquires Varsity Spirit Fashions & Supplies.

16

26.    In 1994, Varsity acquires United Spirit Association (USA) cheer camps.

27.    In 1994, Varsity acquires Intropa International Tours/USA, Inc. from Elisabeth Polsterer.  Intropa specializes in group trips for cheerleaders, bands, choirs, orchestras, dance and theater groups, and other school-affiliated or performing groups which tour in the continental United States, Hawaii, Canada, Europe and Israel.

28.    In 1995, American Cheerleading Magazine was established which was later acquired by Varsity.

29.    In 1996, Jamin Spirit Productions (JamBrands) was incorporated and eventually would be purchased by Varsity.

30.    In 1996, Varsity acquires United Special Events, Inc., a large California cheerleading camp from its founder Mr. Michael Olmstead for $1.95 Million.

31.    Prior to 1987, the NCA placed All Star teams into the same divisions as teams that represented schools and sports leagues. In 1986, the NCA created a separate division for teams lacking a sponsoring

17

school or athletic association, calling it the All Star Division and debuting it at its 1987 cheer competitions. As the popularity of this type of "All Star" team grew, more and more of them were formed, attending competitions sponsored by many different organizations and companies, each using its own set of rules, regulations, and divisions.

32.    Webb's new business, UCA, ultimately became Varsity, and soon outgrew its only rival, Herkimer's NCA. Varsity later in 2004 acquired NCA.

33.    In 1997, Varsity announces extension of agreements with Walt Disney Company and ESPN.

34.    In 1997, Kevin Brubaker creates CheerSport which would grow to be one of the biggest and premier cheerleading competition events in the United States and is held each year in Atlanta, Georgia with over 40,000 cheerleaders attending.

35.    In 1997, cheerleading continued to grow. Varsity cheerleading camps in 1997 were attended by approximately 206,000 participants.

18

36.     In  1997,  Riddell  acquires  Varsity  Spirit  Corp.  and subsidiaries for $91M,Varsity Management pays $4.4M for remaining outstanding stock, Jeff Webb (President/CEO of Varsity) becomes Vice Chair of the Company and a Board member, Riddell Group Division controls sports products and trademark licensing segments while the spirit segment is conducted through the Varsity Group Division.

37.     In 2003, the USASF (United States All Star Federation) is established.  USASF's trademark, domain name and offices are all Varsity owned.  It is widely known that the USASF was formed to force out  the  newly  established  NACCC  (National  Allstar  Cheerleading Coaches Congress). The NACCC was the first attempt by All Star cheer coaches to govern themselves and to develop their own universal set of rules and consisted of coaches from all over the United States.  Within a few short years the NACCC was taken over by the Varsity run USASF and the NACCC was then dissolved by Jeff Webb and the USASF.

38.     In 2003, Varsity TV.com is registered.

39.   In 2003, Varsity enters into a strategic alliance with the National Federation of State High School Associations.  Varsity pays close to $3M until 2010 (future contracts to be determined) in exchange for the Federation endorsing Varsity's cheerleading/dance team championships.  In addition to these fees, Varsity will pay NFSHSA contingent fees based on membership (AACCA) and participant increases over an established base level.

40.   In 2003, cheerleading coaches formed an independent 501(c)(3) organization, called the National All Star Cheerleading Coaches Congress (NACCC), to establish uniform rules for All Star Cheer. Varsity, along with the NCA, CheerSport, and America's Best, created the USASF with the same goal of setting uniform rules and judging standards for All Star Competitions.

41.   In 2003, the National All Star Cheerleading Coaches' Congress was formed by 5 coaches (Jamie Parrish, Joelle Antico, Elaine Pascale, Victor Rosario, and Kristen Rosario).  It was an organization open to all event producers (Varsity and non-Varsity alike) as well as all

20

coaches and gym owners.  The group met in Atlanta, and assembled, and voted in the <u>first</u> set of universal All Star cheerleading rules.

42.     This was seen by Varsity as a threat.  So much so, that they, formed, created, and funded the USASF in less than a week of the NACCC gathering to compete with the NACCC.  They obtained "buy in" from prominent gym owners by providing fully paid trips for teams to attend the first ever World Championships in Orlando.

43.     Varsity outspent the NACCC, recruiting key members of the organization such as Morton Bergue, and introduced the "bid" model to the World Championships to force compliance from gym-owners.

44.     Several   years   later,   after   being   pummeled   by Varsity/USASF, the founding members of the NACCC were forced to allow the USASF to absorb NACCC. The USASF agreed that the NACCC would become the "rules committee" of the USASF in perpetuity as an olive branch. This meeting was held in Memphis in the boardroom of Jeff Webb, and the meeting was run by Jeff Webb. Varsity claims that the USASF is totally independent and

21

separate from Varsity.  This is false.  If Varsity does not "run" the USASF, then why did Jeff Webb run this merger meeting?  How was he able to "make a deal" on behalf of the USASF with no USASF board present?

45.    However, in just a few years after the merger, the NACCC was dissolved by Varsity, and all rules changes/decisions went back to being made by the Varsity controlled USASF board. Thus, keeping Varsity's control of the trajectory of the sport of All Star cheerleading void of any transparency, fair representation, or gym-owner/coach input.

46.    Defendant USASF acquired NACCC in 2005. USASF claims to be completely independent but is beholden to Varsity as its board and votes are stacked with employees from Varsity, or coaches that directly benefit from Varsity's Network agreements and/or Family Plan rebate programs.  Because they receive this rebate (kickback), they are loyal to Varsity.  USASF hosts the Worlds (which is one of the top three major competitions) which was held for the first time on April 24, 2004.

22

47.     USASF has always been captive to Varsity. Varsity funded the USASF at its inception with a $1.8 million interest-free loan. USASF previously shared a corporate address with Varsity. Varsity owned the USASF trademarks until 2017. Until recently, USASF employees worked at Varsity's headquarters in Tennessee, and USASF's office is currently still mere miles away from Varsity's headquarters.

48.     For at least some period of time, USASF's and Varsity's finances were intermingled such that the USASF employees received their paychecks from Varsity. In accordance with the explicit bylaws of USASF, a permanent majority of USASF's voting board members are allocated to seven All Star Competition brands (UCA, CheerSport, NCA, USA, American Cheerleaders Association, Universal Dance Association, and JAMFest). Varsity currently owns <u>all</u> of these brands.

49.     In 2004, Inside Cheerleading Magazine was founded.

50.     In 2004, Varsity acquires National Spirit Group.

23

51.　In 2006, Varsity TV starts production.  Varsity requires each event participant to sign an entry waiver allowing the filming and distribution to be owned by Varsity while VTV sells promo advertising to Gatorade, etc.

52.　In 2006, Ozone, maker and seller of All Star cheerleading and gymnastics uniforms, is established which is later bought by Varsity.

53.　In 2007, Varsity Brands establishes USA Cheer (USA Federation for Sport Cheering) in Texas.

54.　In 2007, Varsity Brands establishes ICU (International Cheer Union) to move towards cornering the international market.

55.　In 2008, Varsity Brands' Sr. VP Bill Boggs sends restrictive "exclusivity" email to college coaches:

"After much thought and deliberation and based on a number of factors, NCA/ NDA (Varsity) is initiating a new policy related to College Nationals: Due to TV, admin concerns regarding school-based priorities, image and funding, and sponsorship considerations, teams that compete in NCA/NDA College

24

Championships may not be eligible to participate in any other event promoted as a cheer or dance "national championship."

56.   NOTE: This is a for-profit company dictating which competitions college teams may enter.

57.   In 2008, NCAA changes its insurance policy for cheerleading clubs/teams on campuses—it will no longer provide catastrophic insurance. Varsity then sells (through NCAA) three (3) separate insurance policies for university purchase, administered by Varsity, but with limitations that only insures teams attending Varsity competitions and no others.

58.   In 2008, IEP (Independent Event Producers) created by eight (8) independent companies meet in New Orleans to discuss forming an organization to strengthen their independence and competition in the marketplace that is being dominated by Varsity.  Those IEP's were Mardi Gras—later Varsity acquired, UPA Cheer & Dance—later Varsity acquired, Cheer America, Pac West—later Varsity acquired, WSA, Spirit Celebration—later Varsity acquired, Champion Cheer—later Varsity acquired, and Cheer Ltd—later Varsity acquired. The

25

IEP's devised a mission statement, goals, organization structure, and initial plan in 2008 but most IEP's were eventually purchased by Varsity.

59.    In 2010, Varsity acquires Just Briefs only to close it despite hiring CEO Tish Reynolds as part of the purchase.  Varsity has a history of buying up competitors and simply disbanding them to eliminate competition.

60.    In 2010, Varsity, a for-profit company, informs all colleges by email that any college who competes in NCATA (National Collegiate Acrobatic & Tumbling Association) format and continues to compete in Acro & Tumbling, will not be able to attend the Varsity sponsored/owned college nationals.

61.    In 2011, Varsity merges with Herff Jones, a leading manufacture/publisher of scholastic and educational products such as class rings, diplomas, yearbooks, caps & gowns, graduation announcements, etc.

26

62.   In 2011, the USASF (run by Varsity) and Jim Chadwick issued a letter to all 1,200 members banning them from attending any non-Varsity competition alleging to be a "World/International" or "Worlds" competition except for the world/international competitions (ICU) run or sponsored by Varsity.  ICU and Karl Olson issue letters to all 101 plus member federations banning entry into any and all IFC (International Federation of Cheer) competitions.

63.   In 2012, Varsity enters the cheer magazine industry by purchasing American Cheerleader magazine and ceases advertising in any competing magazine.  Without advertising dollars, a competing magazine called "The Cheerleader Magazine" is forced out of business.

64.   In 2012, Varsity Spirit Corp. merges with Varsity USA, VBI Ventures, Varsity/Intropa Tours, USA.

65.   In 2012, Varsity acquires CheerSport (includes Cheerlogistics and Universal Spirit).  This includes the CheerSport competition held annually in Atlanta at the World Congress Center and attended by over 40,000 cheerleaders making it one of the largest

27

competitions held each year.  This also includes CheerSport TV and over 30 other competition events.

66.     In 2012, Varsity cancels its relationship with an athletic shoes/sneaker company called Nfinity (approximately 40% of Nfinity's business) and announces that it will be manufacturing and selling its own brand of athletic shoes/sneakers.

67.     In 2012, Varsity announces via a letter from employee Les Stella to all USASF members that:

> "While USASF generates revenue to support the organization and to repay Varsity's loan over time, it lacks resources to administer The Cheerleading and Dance Worlds and appreciates Varsity's support of more than 300 staff including tournament officials, logistical personnel, registration staff, TV liaisons, translators and international visa administrators, and other necessary administrative and operational functions. Also, without Varsity's support, USASF would not be able to provide the same level of benefits it now does to full time staff members."

This letter is sent to justify why Varsity is running the cheerleading sport rule-making body that governs cheerleading and is supposed to be totally independent.

68.   In 2013, the ICU issues another ban to coaches, judges and athletes declaring that they cannot enter IFC (a world governing body) competitions and publishes a list of offending "prohibited" coaches, judges and athletes.

69.   In 2013, USA Cheer Board of Directors: 15 votes, 4 dedicated for National Alliance for School Cheerleading (NASC)—(NASC has no discovered tax structure), 3 votes dedicated for AACCA, 3 votes for USASF, 4 for NASC, 3 for athletes, 1 for high school, 1 for NCAA (unfulfilled)— 9 out of 14 (one unfulfilled position, NCAA) filled by Varsity affiliated company reps or employees.

70.   In 2013, GrowCheer.org is formed by a group of unrelated industry companies (non-Varsity owned or operated) with a singular purpose—to grow the sport of cheerleading announcing:

"We believe the first (and most important) step in fostering

29

future growth in our sport is a FREE and INDEPENDENT USASF."

71.    Cheer Zone ™, GK Elite Sportswear, LP, GTM Sportswear, Inc., Motionwear, LLC, Nfinity Athletic LLC, Rebel Athletic™, and Team Cheer™ comprise the organization. GrowCheer.org then submits proposals to USASF outlining the need to separate from Varsity and be independent and offering to have GrowCheer.org companies to assume all debt to Varsity on loan to the USASF for accomplishing this independence.

72.    Varsity Public Relations VP, Ms. Sheila Noone, not the USASF, responds to GrowCheer.org's request for independence with no response from USASF as follows:

"Everything Varsity does is with an eye towards what is best for the young athletes we serve. No one has more of an interest in growing all disciplines of cheerleading than Varsity, and we feel we have been a strong partner to the USASF and its members"

73.    In 2013 UCA (Varsity company) issues banning statement: "It is understood that teams participating in World University Cheerleading Championships will not knowingly and willingly

30

participate in any other event promoted as a 'World University Cheerleading Championships'. (Exception: Approved multi-sport international events congruent with the World University Cheerleading Championships and International Sport Authority organizations). Teams who do not adhere will be disqualified for the 2013 World University Cheerleading Championships and will forfeit the opportunity to participate in the tournament the following year." Basically, Varsity is dictating to all teams that they are to only compete in Varsity sponsored or owned events.

74.    World University Championships Trademark owned by Varsity.

75.    In 2013, Herff Jones (owned by Varsity) purchases for $460 M and merges with BSN Sports (manufacturer of all athletic sports uniforms and equipment, such as football, baseball, softball, track, basketball, lacrosse, volleyball, soccer, wrestling and cheerleading) for all College, High School and Junior High Schools.

76.    In 2013, Varsity realizes that the lower level cheerleading teams need an end of the year championship and creates The Summit competition to fill this void and to further limit competition from the

31

independent (non-Varsity) event production companies that specialize in this market.

77.    In 2013, BSN (Varsity owned) acquires team division of Todd & Moore Sporting Goods, Inc.

78.    In 2013, BSN acquires Spokane Athletic Supply.

79.    In 2013, BSN acquires Kohlmyer Sporting Goods.

80.    In 2013, AACCA reports membership of over 70,000 cheerleading and dance coaches across the United States.

81.    In 2013, the USASF announces that they intend to move their current offices from Varsity headquarters in Memphis to an office building a few miles away from Varsity. This never happens until several years later.

82.    In 2013, the USASF changes their membership application for yearly membership to include email addresses, addresses, phone numbers, and birth certificates all stored on an unsecured site and shares this information with Varsity allowing Varsity incredible sales marketing information not available to their competitors.

83.    In 2013, BSN and Pop Warner Little Scholars announce a partnership.

84.    In 2014, BSN acquires East Texas Sports Center, Inc.

85.    In 2014, BSN acquires Olympia Sporting Goods, Inc.

86.    In 2014, BSN acquires Judge Little Co.

87.    In 2014, Varsity acquires Cheer Limited and its large competitions and prestigious events including Open College Championships and its High School Invitational.  One of the largest such events is Canam in Myrtle Beach, SC with 5,000 athletes and over 12,000 spectators.

88.    In 2014, Varsity/Herff Jones rebrands to "Varsity Brands" and announces Jeff Webb as its CEO.

89.    In 2014, BSN acquires F & F Sport Shop, Inc.

90.    In 2014, Herff Jones/Varsity Brands explores sale of the entire company at a cost of $1B.

91.    In 2014, BSN acquires Westside Team Sports, LLC.

33

92.    In 2014, Varsity enters into preliminary discussions to be purchased for $1.5 B from an investment group led by Charlesbank Capital Partners.

93.    In 2015, Varsity acquires JamBrands (their largest remaining independent competition event producer).

94.    In 2015, BSN acquires Ultimate Team Sales.

95.    In 2015, Varsity acquires Allgoods, LLC, a $38B Texas fund raising company (one of the largest and fastest growing apparel-oriented fundraising companies in US).   This acquisition expands Varsity Brands' ability to provide schools and league teams a comprehensive, turn-key fundraising and spirit solution for more than 16,000 teams across the country and will be poised to grow substantially as part of Varsity Brands.

96.    In 2016, Cheerleaders from Clemson and Alabama showcase Varsity Brands uniforms.   Webb says Varsity partners with schools by helping with signage and branding (offering one stop shop sales approach for everything that the school needs for sports, band and

34

scholastic rings, yearbooks caps and gowns, etc.). Webb creates deeper purchasing ties (exclusive sales agreements) between Varsity and schools, not just cheerleading teams. These exclusive sales agreements are meant to push competitors out of the market and could possibly violate NCAA athlete eligibility rules. Varsity partners with Largo High School in Holiday, Florida for rebranding as an example.

97.   In 2016, BSN acquires Lid Team Sports from Genesco, Inc.

98.   In 2016, BSN acquires Jerry's Sporting Goods.

99.   In 2016, BSN acquires Idaho Sporting Goods.

100.   In 2016, Varsity and Disney agree to build a competition facility located at Walt Disney World Resort's ESPN Wide World of Sports venue.

101.   In 2016, Varsity enters an 8-year agreement with FloSports to provide live streaming coverage of The Cheerleading Worlds™ and The Dance Worlds™ on FloCheer.com. Users must sign up to become FloPRO subscribers for monthly/annual subscriptions of $29.99 and $149.99, respectively. Competitors are required to sign a competition

35

entry form waiver giving Varsity exclusive rights to their image via video, including gym school protected logos.

102. In 2016, BSN acquires Steadman's Sports Center in Los Angeles.

103. In 2016, BSN acquires S & S Sports Center in Los Angeles.

104. In 2017, BSN acquires Marlow Sports, Inc.

105. In 2017, BSN acquires the team division of Erie Sports Store in Pa.

106. In 2017, Varsity acquires Spirit Celebrations which was a competitor as a cheerleading/dance independent event producer for over the past 19 years established by Billy Roy Smith.

107. In 2017, BSN acquires Lowe's Sporting Goods in Kentucky.

108. In 2017, BSN acquires Kimmel's Athletic Supply in Washington.

109. In 2017, BSN acquires Newberry Sporting Goods in Ohio.

36

110. In 2017, Varsity enters into an exclusive agreement with Rock Your Hair, a California based company with popular hair products used in the cheer industry.

111. In 2017, BSN acquires Athlete's World/Stadium Sports in west Texas.

112. In 2017, BSN acquires Academy Sports in UT.

113. In 2017, Varsity enters into an exclusive agreement with Fancy Face Cosmetics, a Chicago based company with popular cosmetic products used largely in the cheer industry.

114. In 2017, Varsity creates the Impact Program to sell a rebranding product to Colleges, High Schools and Junior High Schools. John Newby heads the program.

115. In 2017, Varsity transfers trademark rights to USASF because USAF satisfies its loan.

116. In 2017, Varsity Spirit promotes Bill Seely to President and he also remains president of USA Cheer.

37

117.  In 2017, Varsity initiates VIP Branding (school banners, window banners, etc.).  SpiritWorks (St. Jude fundraising project) to sell additional products to schools.

118.  In 2017, Varsity publishes Video Media Policy.  No live streaming or commercial recording allowed or face disqualification. Within 24 hours, Varsity re-states policy is to protect athletes from professionals creating unauthorized recordings for commercial purposes or financial gain.  Varsity then uses videos of competitions for commercial purposes and financial gain through their exclusive ownership of recording rights.  (i.e. Varsity obtains a release from all athletes, sells the competition video to the general public for financial gain, and follows music industry regulations regarding music rights. Varsity presents video with no music, allegedly avoiding a lawsuit by the music industry).

119.  In 2017, Varsity acquires Mardi Gras, an independent event producer and original member of IEP (Independent Event Producers).

120.   BSN (Varsity) acquires partial assets of Hibbett Team Sales, distributor of team apparel and equipment in Al, Ga., and Fl.

121.   In 2018, Varsity acquires Team Epic Brands, an independent event producer with eleven (11) event brands and companies offering 170 plus competition events in 32 different states.

122.   In 2018, BSN acquires Gulf Coast Athletic Supply based in Sugar Land, Tx.

123.   In 2018, BSN acquires NY and NJ based DC Sports, Inc., a distributor of team apparel and goods in NY, NJ, CT and RI.

124.   In 2018, BSN acquires Midwest Sportswear & Athletic Supply based in International Falls, MN, a distributor of team apparel.

125.   In 2018, BSN acquires Reynolds Team Sales based in Pittsfield, MA, a distributor of team apparel in MA, CT and NJ.

126.   In 2018, Varsity transfers trademark rights to AACCA. Then AACCA and USA Cheer join forces and AACCA is dissolved in TN.

127.   In 2018, BSN acquires Kelly's Sports, LTD in PA.

39

128.  In 2018, it is announced that Varsity Brands and subsidiaries are to be acquired in a sale to Bain Capital for over $2B.

129.  In 2018, Varsity Brands and Go FundMe announce an exclusive partnership to provide a social fundraising solution for America's schools and sports teams.

130.  In 2018, BSN acquires TEAMLINE, LTD in TX.

131.  In 2018, Varsity announces a partnership with BAND, an app for mobile communication.

132.  In 2018, Varsity acquires Jeff Sporting Goods in Port Jefferson, NY.

133.  In 2018, Play On! Sports (a joint venture between 2080 Media, a Jeff Webb partner, and Nat'l High School) acquires The Cube announcing:

"Creating largest single destination to watch live high school sports broadcasts at www.NFHSNetwork.com. Acquisition of The Cube and its 4,000-plus schools that broadcast high school sports events—more than 100,000 events will be streamed live on NFHS Network during 2018-19 school year. NFHS Network, joint

40

venture between National Federation of State High School Associations (NFHS), its member state high school associations and PlayOn! Sports, now in its fifth year of covering high school sports on its digital network. More than 2,000 high schools broadcast events on NFHS Network through its School Broadcast Program. NFHS Network is also home to state high school playoffs and championships across the country"

134.   In 2019, it is printed in the Investor's Business Daily that Varsity Brands' annual revenues exceed $1.35 billion with more than 4,000 full-time employees according to the company. Webb is currently Varsity Brands' chairman; 330,000 athletes in teams attend over 4,000 Varsity Spirit cheerleading training camps each summer; Varsity Spirit puts on over 600 cheerleading competitions across the country annually, with 900,000 participants; Varsity has partnered with Disney for 25 years and hosts nearly 90,000 athletes at seven of Varsity Spirit's most premier events at Walt Disney World Resort in Orlando, FL; for 35 years, Varsity Spirit partners with ESPN to broadcast their cheerleading competitions around the world, reaching over 100 million homes, and 32 countries annually.

41

135.  In 2019, the USASF mandates that all members take a SafeSport course for $20.

136.  In 2019, BSN acquires Sports Page Team in Pella, IA.

137.  In 2019, Varsity Spirit acquires Director's Showcase International (DSI), a wholesale distributor of marching band accessories and color guard equipment globally through an exclusive dealer network giving them a presence in every state and 12 countries.

138.  In 2019, BSN acquires Naperville's Janor Sports serving Chicago, IL.

139.  In 2019, BSN acquires Team Division of Johnny Mac's based in St. Louis, MO serving MO, IL and MI.

140.  In 2019, BSN acquires H & L Sporting Goods in Everett, WA.

141.  In 2019, BSN acquires T & T Sportman's Shop in Charleston, SC.

142.  In 2019, BSN acquires Legacy Team Sales, one of the largest distributors of team sports apparel and equipment in central Florida.

42

143.   In 2019, USA Cheer promotes STUNT as an NCAA emerging sport.

144.   In 2019, BSN acquires Key Sport in Rolla, MO.

145.   In 2019, a group of cheer gym owners call a meeting in Miami to bring an agenda to light regarding the many issues still plaguing the cheer industry—calling for those that want change to email a complaint to antitrust@FTC.gov.

146.   In 2019, Varsity launches a new brand, Varsity Pro, focused on NBA and NFL professional dance/cheer teams. Varsity Pro will offer pro dance teams custom, performance ready routines from a team of talented choreographers as well as uniforms.

147.   In 2019, Varsity launches a new division, Varsity Performing Arts to serve the performing arts community, including marching bands, pep bands, color guards and percussion groups. It will offer new training camps and competition experiences to schools and performers nationwide.

148.   In 2019, BSN acquires Hillock Sports, LLC in Murray, UT.

43

149.   In 2019, Varsity acquires Stanbury Uniforms, a 100-year-old Missouri company and leading provider nationwide of band apparel.

150.   In 2019, Varsity acquires SA Feather Co., a wholesale feather goods supplier and premier manufacturer of marching band plumes.

151.   In 2019, BSN acquires David Bowen Sporting Goods in Pensacola, FL.

152.   In 2019, Varsity's yearly revenue tops $2 billion.

153.   In 2019, BSN acquires Wayne Sporting Goods in Wayne, PA.

154.   In 2020, BSN acquires strategic assets from Riddell's College Town Division.

155.   In 2020, BSN acquires Key Business Lines from Longstreth Sporting Goods.

156.   In 2020, BSN acquires Athletics Unlimited in Sacramento, CA, a team supplier in CA and NV.

157.   In 2020, BSN acquires Nill Brothers Sports that serves Kansas and MO.

44

158.  In 2020, Varsity partners with CaptainU, a self-managed recruiting software tool (app) that connects high school athletes with college coaches.

### 1.   The Competition Cheerleading Monopoly

159.  There are three recognized "end of season" championships for competition All Star Cheerleading: Worlds, The Summit, and the U.S. Finals. The Summit, and U.S. Finals are owned, produced, and promoted by Varsity. The Worlds is owned, produced, and promoted by USASF with contracted help from Varsity who then controls and runs the actual competition. The Worlds is held at Disney World every April for the best All Star teams (levels 6 & 7). While a scattering of teams from other countries attends the event, the teams from the United States have largely dominated attendance at the competition.

160.  The Summit is also held in Disney World every year typically at the beginning of May for levels 1 thru non-worlds level 5 teams. Worlds is available to only level 6 and 7 senior and open teams which are the more skilled teams and the higher age levels.

45

161. "Bids" are highly coveted formal invitations to compete in these All Star championships. All Star teams cannot attend the All Star championships without one. Thus, earning bids to All Star championships (particularly Worlds), and ultimately succeeding at those All Star championships, is the primary goal of All Star teams. All Star teams earn these bids by attending and succeeding at All Star competitions. Success at attaining these bids at these events correlates to whether or not a gym can be successful and attract cheerleaders to their gym because every kid wants to go to Disney.

162. Bids can be fully paid which, as the name implies, means the All Star competition producer pays the All Star teams's entry fees and all travel and hotel costs; partially paid, meaning the All Star competition producer pays only a partial amount (typically covering entry fees but not travel or hotel costs); or at-large, meaning that the All Star team can compete but must pay its own way. All Star competition producers with the rights to confer the bids determine how those bids are awarded. Typically, fully paid bids are awarded to first place

46

winners of major USASF-sanctioned All Star competitions. Partially paid and at-large bids are earned by the All Star teams at those same USASF-sanctioned All Star competitions.

163.   USASF, under the control of Varsity, decides which All Star competitions have the right to award bids to Worlds, the Summit and the U.S. Finals.  Varsity and USASF severely restrict competition in the All Star competition market by limiting the number of All Star competitions that can produce bids to Worlds at 42. Varsity owns 33 of these All Star competitions with the right to award bids to Worlds. USASF also allocates the number of bids that each of those 42 All Star competitions may award, and each All Star competition may award 2 to 8 bids. USASF has awarded Varsity the vast majority, so Varsity controls 80% of Worlds' bids.  The remaining 20% are still controlled by Varsity by their anti-competitive conduct.  Stay on Varsity's good side or they will eliminate you.  For instance, in order to remain an All Star Competition with bids, a competitor must maintain at least 125 competition gym entries at their competition.  If you fail to have at least

47

125 teams at your competition, then USASF places that competition producer on probation and if repeated, can lead to revocation of your right to award bids.  Varsity, through its control of the USASF has implemented this set of rules.  If Varsity, for whatever reason, wants to eliminate a competitor's bid rights, they simply schedule two Varsity sponsored competitions in the same area where their competitor bid competition is being held which makes it almost impossible for the competitor to draw the necessary 125 entry team requirement.  Varsity records refer to this type of conspiracy to monopolize activity as "Target" or "Attack" strategy.   These records show a specific intent to destroy competition and to further their intention of formulating a monopoly.  This is but one example of Varsity's conspiracy to monopolize and control the industry to the detriment of their competitors.

164. Varsity decides which All Star competitions have the authority to award bids to The Summit and the U.S. Finals. Varsity uses its market dominance to restrict competition by allocating 100% of The

48

Summit and U.S. Finals bids exclusively to the All Star competitions it owns and operates.

165. Varsity uses its dominance of the All Star competition market, its control of USASF, and its control of All Star championship bids, combined with the other conduct that is part of the exclusionary scheme, to ensure that All Star teams will attend Varsity's entry-level All Star competitions rather than those owned and produced by Varsity's competitors (IEP's, Independent Event Producers).

166. USASF is a "member" of USA Cheer. USA Cheer shares its address and telephone number with Varsity and does not have any employees. Instead, it contracts with Varsity Spirit to use Varsity's employees as needed. The USA Cheer President, Bill Seely, is also the President of Varsity Spirit. Two of the three USASF Vice Presidents and the Executive Director were or are current and former Varsity employees.

167. According to USA Cheer, "most" All Star gyms, All Star teams, and All Star competitions "are under the umbrella of" USASF,

49

meaning that USASF rules govern most All Star gyms, All Star teams, and All Star competitions. USASF uses that control to require that All Star gyms, All Star teams, and All Star team coaches join USASF and pay annual membership dues to participate in USASF-sanctioned All Star competitions, primarily those owned and produced by Varsity.

168. In 2007, Varsity founded the nonprofit International Cheer Union ("ICU"), which acts as cheerleading's international governing body. ICU was created to assist and encourage global development of cheerleading. Varsity provided the initial financial support for the launch of the ICU, similar to how it initially funded USASF.

169. Prior to 2016, The JAM Brands was an independent event producer in the United States and Varsity's chief competitor. The JAM Brands produced All Star competitions that included divisions for high school, college, and All Star teams, as well as recreational divisions. The JAM Brands owned Cheerleaders of America ("COA"), a major IEP in Ohio. The JAM Brands also owned America's Best, an IEP in Texas.

50

170. The JAM Brands produced many of the largest and most popular All Star competitions in the United States, including The MAJORS and The U.S. Finals, one of the most coveted All Star championships. It also owned All Star competitions that awarded 24 of the bids to Worlds. Moreover, the Jam Brands produced an All Star competition branded as "JAMFest Cheer Super Nationals," at which over 550 competition All Star teams competed. In addition, The Jam Brands was a disruptive and aggressive competitor, introducing new event concepts that competed directly with Varsity's All Star competitions. Prior to its acquisition by Varsity, The Jam Brands generally offered free admission to event spectators, many of whom are the parents and other family members of the Cheerleaders.  Basically, the Jam Brands competitions were successful and profitable for many years with free admission for parents and spectators at their competition events. Varsity acquired Jam Brands and greedily started charging parents and family members (no checks or credit cards, in cash only) admission fees that have escalated in recent years.

51

171. Varsity and The Jam Brands announced their pending merger in November 2015. In a letter to All-Star gym owners, Varsity assured them, "For you as a customer, nothing will change." Plaintiffs and their proposed Class saw increases in All Star competition registration fees and admission fees a year later.

172. In addition, with the acquisition of The Jam Brands, Varsity also gained control over The Jam Brands' board seats on the USASF and the International All Star Federation ("IASF"), solidifying Varsity's control over the major sanctioning bodies that regulate competitive All Star cheer and allowing Varsity to use those regulating bodies to foreclose competitors from the relevant markets, as discussed herein.

173. One article described it as follows:

The Alliance's birth coincided with one of Varsity's most audacious moves–and for [rival All-Star Apparel manufacturer] Rebel, its most shattering. In October, Varsity–in a deal widely criticized on industry chat boards–acquired JAM Brands, the second-largest event producer and by far Rebel's most important marketing partner. Just a few months earlier, JAM Brands co-owner Dan Kessler had explained why his company had chosen Rebel to be its

exclusive uniform sponsor. "They were edgy. The look was real," said Kessler. "We felt there was some good synergy there."

174.  That synergy vanished later that year, while Rebel was negotiating to renew the partnership. "Suddenly those talks just fell apart," says Noseff Aldridge. (Note:  this is similar to the loss described by Ms. Heidi Weber, owner of Plaintiff American Spirit and Cheer Essentials, Inc., in her affidavit attached to the original lawsuit as Exhibit "A" to ECF No.1). A few weeks later, Varsity and JAM Brands announced their union. JAM Brands ran most of the high-profile competitions that Varsity doesn't own. Together, they now controlled over 90 percent of the major events, according to competitors.

175.  Prior to Varsity's spate of All Star competition acquisitions, there were still a number of "independent" All Star competition event producers, known as "Independent Event Producers" or "IEPs," left in the All Star competition market, including: All Star Challenge (later acquired by Varsity); Aloha Productions (later acquired by Varsity); America Cheer Express; American Spirit Championships; Cheer America; Cheer Ltd. (later acquired by Varsity); Cheer Tech; COA Cheer

53

& Dance (later acquired by Varsity); Connecticut Spirit Association; Golden State Spirit Association (later acquired by Varsity); JAMZ Cheer and Dance; Mardi Gras Spirit Events (later acquired by Varsity); Nation's Best (later acquired by Varsity); Pac West Spirit Group (later acquired by Varsity); Spirit Cheer (later acquired by Varsity); Universal Spirit (later acquired by Varsity); UPA (later acquired by Varsity); US Spirit (later acquired by Varsity); Valley of the Sun; WCA; Worldwide Spirit Association; Rockstar Championships; and Xtreme Spirit. Now, as a result of Defendants' conspiracy and enterprise scheme, which included inter alia, acquisitions of The JAM Brands and other independent event producers, Varsity owns at least twelve of these All Star competitions and has relegated the rest to the smaller venue status through the exclusionary scheme, rendering the remaining potential rivals in the All Star competition market incapable of challenging or competing with Varsity's dominance.

     **a.**    **Varsity Control Over the Competition Cheerleading and Scholastic Governing Boards.**

54

### i.    Competition Cheerleading Governing Board.

176. Defendant USASF is a governing body that sanctions All Star Competitions and provides a set of rules and regulations to govern those events. The organization credentials coaches, certifies safety judges, sanctions events, and maintains safety guidelines. The USASF also produces and sanctions the Worlds All Star Championship. When it first established the Worlds, the USASF offered Varsity a no-contest bid to produce the event, and it did not allow any other IEPs, such as Rebel or Rockstar Championships, to compete for the right to produce the event. To this day, USASF has never bid out or sought other contractors for judging or staffing the Worlds competition but has continued to pay whatever exorbitant price Varsity has charged them and this has caused inflated prices being charged to the parents and gyms for attending this coveted event. This is because USASF must pay inflated bills to Varsity for judging and staffing, the event then costs more, and this inflated cost is then passed along and charged to the parents and gyms in entry and attendance fees. While All Star gyms

55

are not technically required to belong to the USASF, a USASF membership is required to compete for the All Star Championships, and so All Star gyms have no choice but to join the USASF if they wish to be viewed as high-quality organizations.

177. Varsity founded the USASF in 2003 and funded this effort by extending the USASF a $1.8 million interest-free loan. Varsity submitted the original trademark application for the marks "U.S. All Star Federation" and "USASF," listing itself as owner. For at least the first 15 years of its existence, the USASF's offices were located at Varsity's corporate address, a Varsity representative answered the phone for the USASF, USASF employees were paid directly by Varsity, and Varsity cashed checks issued to the USASF.

178. Varsity controls the USASF board of directors. The USASF board is empowered to set policy for the USASF. The board is composed of 13 voting members, one seat each for the seven All Star Competition producers that started the USASF, the USASF Chairman, a senior USASF staff member, and four program owner members, including the

56

Chairman of Connection. Two USASF board seats are permanent and are held by representatives named by the Chairman of the USASF. As Varsity has acquired more and more of the USASF's founding event producers, it has continued to build its presence on the USASF board. Since the acquisition of The JAM Brands and Epic Brands, Varsity has control over 75% of the USASF board seats.

179. The USASF's website is located at www.usasf.net, a URL owned by Varsity, although Varsity now seeks to conceal its ownership and control of the URL behind the registration of "PERFECT PRIVACY, LLC."

180. In response to a survey administered by "Cheer Industry Insights" in 2012, All Star gyms called for "a separation of [USASF] Board Members affiliated with Varsity Brands to allow for more representation among IEPs, large and small gym owners, and other entities within the industry." That separation has not occurred. On the contrary, as Varsity has acquired additional IEPs, it has gained control of additional seats on the USASF board. By the time it completed its

57

acquisition of Epic Brands in January, 2018, the vast majority of the USASF board was affiliated with Varsity, more than enough for Varsity to dictate USASF policy.  Varsity has used that control to dictate to USASF certain rules or policies that would favor Varsity's competitive edge to the detriment of Varsity's competitors.

181.  Varsity has used its control over the USASF, and conspired with the USASF, to foreclose and impair rival IEPs from getting traction in the Relevant Markets. Varsity used its control of the USASF to limit the number of coveted All Star championship bids that All Star competition producers can award to All Star teams.  The USASF controls which All Star competitions producers can provide bids to these high-profile All Star championships. According to USASF rules, only "Tier 1" All-Star competition producers can offer fully-paid bids to Worlds. USASF rules also limit the number of Tier 1 All Star competition producers to 42.  Prior to its acquisition of The JAM Brands and Epic Brands, Varsity owned 21 of the 42 All Star competitions permitted to offer fully-paid bids to Worlds. Today, Varsity owns 33 of

58

the 42 Tier 1 All Star competitions. Conversely, only 9 of the 54 IEPs (Independent Event Producers) credentialed by USASF can offer bids to Worlds.

182. In addition, while the number of Tier 1 All Star competitions is fixed, the number of bids, fully-paid and otherwise, that any one of those All Star competition producers may distribute can change. And Varsity consistently uses its control of the USASF to increase the number of bids available at its All Star competitions after Varsity acquires them and they are producing events under the Varsity banner. Varsity distributes well over 80% of all Worlds bids.

183. Access to Tier 1 status and the ability to offer fully-paid bids to Worlds is critical for an IEP to gain sufficient traction in the All Star competition market and seriously challenge Varsity's monopoly power. That is because the primary goal of most All Star teams is to win All Star competitions to gain fully-paid or partially-paid bids to All Star championships such as Worlds. If an IEP cannot offer such bids, it

cannot attract participation from the most successful All Star gyms, which will reduce the IEP's appeal, reach, and prestige.

184.   Furthermore, the USASF will not let an All Star competition producer hold a bid-qualifying All Star competition within 500 miles of another bid-qualifying competition. This makes it nearly impossible for an IEP to expand and compete further with Varsity. The ultimate result is that the only way for an All Star competition producer to gain additional bids to Worlds is to acquire an existing All Star competition producer that controls such bids. Since Varsity's acquisition of Epic Brands in January 2018, there are few such producers left outside of Varsity's hands. Additionally, the USASF requires Independent Event Producers to submit to them their list of competitions which allows Varsity to know ahead of time where the competitions of their competitors will be held so they can then book a Varsity competition in the same area and squeeze out the competition (see paragraph 168 herein above for an example).

185. All Varsity-sponsored events are USASF-sanctioned. To enter All Star teams in USASF-sanctioned events, All Star gyms, All Star cheerleaders, and All Star team coaches must become USASF members and pay annual membership dues to USASF. These membership dues are USASF's primary revenue source, and it collected over $5 million in membership dues in 2017. USASF currently raises between $5-$7 million in membership dues per year.

186. Though Defendant USASF does not contractually bar its members from participating in non-USASF events, it does require its member gyms to report their full competition schedules for the year, including USASF-sanctioned and non-sanctioned, Varsity and IEP events. USASF shares this information with Varsity, and both Varsity and USASF representatives then pressure the All Star gyms to go only to USASF-sanctioned events, 40% of which are produced by Varsity.

187. USASF also copyrighted it's All Star competition rules in 2016, and it forbids All Star competition producers that have not paid USASF membership dues from using those rules at their events. Since

61

Varsity's dominance in the All Star competition market ensures that all or almost all All Star teams will fill the majority of their schedules with USASF-sanctioned events, USASF's refusal to allow non-USASF IEPs to use the same rules provides a strong disincentive for All Star teams to include such IEPs in their schedules. Doing so would require All Star teams to learn and compete by a different set of rules, forcing them to alter their competition routines for a small share of their yearly competitions. USASF aggressively enforces this scheme through the threat of copyright litigation.

188.  The USASF also uses its competition rules to assist Varsity in maintaining and enhancing its dominance in the All Star apparel market. USASF rules governing apparel are drafted to favor the newest All Star apparel designs being marketed and sold by Varsity.

189.  Bids to Worlds and The Summit are also not awarded at non-USASF events, further discouraging All Star teams from putting these IEPs on their limited competition schedules. In any event, there are not enough IEPs for an All Star team to plan a full season around non-

62

USASF events without attending Varsity (and thus USASF-sanctioned) events.   Therefore, IEP's such as Plaintiff Rockstar Championships, LLC, suffer and incur damages in the form of lost opportunities and lost profits.

190.  USASF also requires member All Star gyms to have and report their liability insurance. USASF encourages All Star gyms to purchase insurance from a particular insurance carrier—K&K Insurance—and, on occasion, will deny All Star gyms' attempts to use other insurance carriers. While K&K is not affiliated with Varsity, K&K both (i) requires All Star gyms to be USASF members before it will provide them coverage, and (ii) charges significantly higher annual premiums to All Star gyms (passed down and charged to the parents of these cheerleaders) that enter their All Star teams in even a single All Star competition that is not sanctioned by USASF.

191.  All Star gyms pay K&K between $19 and $24.55 per All Star cheerleader, but those rates increase to $34 per cheerleader if the All Star gym enters its All-Star team in even a single competition that is

not sanctioned by USASF. For one small All Star gym, which amounts to a $2,300 difference in annual insurance premiums. This insurance arrangement dissuades All Star gyms from attending non-USASF-sanctioned All Star competitions. Most All Star gyms have K&K insurance, and they are afraid that scheduling non-USASF-sanctioned All Star competitions will lead either to higher premiums or to being considered out of compliance and thus having a coverage lapse.

192. Varsity also takes steps to prevent any rival sanctioning organizations from creating non-Varsity controlled All Star championships that could undermine Varsity's dominance. For example, in October 2011, the USASF and IASF issued a joint letter to member All Star gyms, All Star competitions, and All Star team coaches stating that it is:

> "The policy of the USASF/IASF that no athlete, coach, judge, or official is permitted to participate in any way in any event that claims to be a World or International Championship, other than the ICU [International Cheer Union] World Championships for National teams, or the USASF/IASF Worlds for All Star teams.

This stipulation applies to any regional international championship affiliated with an organization claiming to operate a World Championship, other than the ICU and USASF/IASF. Failure to comply with this rule is grounds for disqualifying any athlete, coach, judge, or official from participating in the ICU and USASF/IASF World Championships."

193.   The USASF membership rules specify that members are not permitted to affiliate, partner with, or own non-USASF sanctioned IEPs, and that every All Star gym that wishes to attend USASF events must become a USASF member. Thus, all gyms that attend at least one USASF event per year agree to these exclusionary terms.

### ii.    Competition Scholastic Governing Board

194.  Varsity has established undue influence over each of the state's governing boards which are (American Association of Cheerleading Coaches and Administrators), USA Federation for Sport Cheering, d/b/a USA Cheer (originally AACCA which merged with USA Cheer and regulates both high school and college) and the NFHS (National Federation of State High School Associations is the body that

writes the rules of competition for most high school sports in the United States).

195. Varsity established USA Cheer in 2007 as the national governing body for competitive sport cheer and scholastic cheer. The USASF rule body is under the umbrella of the USA Cheer organization. Again, the majority of the board members and staff are affiliated and/or employed by Varsity.

196. The USASF and USA Cheer have formulated the rules that govern the competitions run by the three major cheerleading associations which are for-profit companies owned by Varsity. The three major cheerleading associations owned by Varsity are the National Cheerleading Association (NCA, which holds the All Star national competition in Dallas, Texas each year where over 1,200 teams compete, and the college nationals in Daytona, Florida each year), Universal Cheerleading Association (UCA, holds high school and college competitions and the college nationals held each year in Orlando,

66

Florida at Disney World), and United Spirit Association (USA, which holds camps and competitions on the west coast).

197.  Each individual state also has their own state organization that agrees to abide by the NFHS rules and/or USA Cheer rules.  For instance, in Oklahoma you would have the governing body called the OSSAA and under them the state board called OCA (Oklahoma Coaches Association, which is coaches for all sports), and you would also have board members for OCCA (Oklahoma Cheer Coaches Association, which is coaches just for school cheerleaders).  These scholastic organizational boards govern cheerleading in the school state and school national championships in addition to ruling over all things cheer, including apparel, cheer merchandise and camps.

198.  Each of these scholastic organizations hold yearly coach's conventions and it is the only time that all the school coaches and athletic directors are together in one venue.  This is the greatest opportunity for an IEP company, apparel company or a camp company to display, vend and to sell their merchandise and services. However,

Varsity has established exclusionary rules through their undue influence over these scholastic boards to exclude any non-Varsity company from attending as a vendor at these state conventions resulting in Varsity having a captive customer marketing monopoly. Varsity accomplished this monopoly conspiracy by giving considerable cash to be the major sponsor of most state conventions.  They also exert control and allegiance to Varsity by providing members of boards with perks such as taking board members to Disney World for what appears to be nothing more than a paid vacation, with all expenses paid including travel, accommodations and Disney Park passes.

199.  Varsity, through their control of USA Cheer, has passed a rule that any school team that wants to compete in either the State finals competition or the National competition, as a prerequisite to qualification to participate in those competitions, the school team must attend a Varsity sponsored camp.  This rule assures allegiance to Varsity and eliminates or severally reduces most camp competitors from being able to hold such camps.  This rule has severally reduced the

68

market to the detriment of camp competitors such as Plaintiff Jeff & Craig Cheer, LLC, d/b/a Jeff and Craig Camps, who have suffered damages in the form of lost customers and lost profits.

200.   Varsity has also influenced state boards to restrict members on the boards by eliminating much of Varsity's competitors from being able to hold membership positions on the boards.   This conspiracy eliminates any undue influence that a board member that is also involved with a Varsity competitor from holding a board membership position.   For example, in Oklahoma, back in 2014, many of the board members on the OCCA (Oklahoma Cheer Coaches Association) were independent coaches hired by schools to coach their school cheerleading teams.   Many of these independent coaches were also employees or owners of businesses that compete with Varsity.   Varsity then went to the OCA (Oklahoma Coaches Association) and requested that they implement a new rule to prevent any independent coach from being a board member on the OCCA board.   The rule was changed at that time to require that all OCCA board members must be coaches who are

employees of the school and not an independent outside coach hired by the school just to coach cheerleading.  This rule change eliminated 75% of the then existing OCCA board members, including the President-Elect, Ms. Heidi Weber (owner of American Spirit and Cheer Essentials, Inc., Plaintiff, and apparel competitor of Varsity) from being able to serve her term as President of the organization.

201.  Varsity's exclusionary scheme has successfully impaired and foreclosed a substantial share of each of the scholastic and competitive cheer markets from competitors. The exclusionary scheme has also created significant entry barriers for would be competitors in the scholastic and competitive cheer markets. As a direct and proximate result, Varsity collectively controls approximately 90% of the All-Star Competition Market, 80% of the All-Star Apparel Market, and over 90% of the scholastic market in the United States.

202. Varsity has foreclosed from access to competitors in the competitive cheer markets, the most significant All-Star gyms in its exclusionary network agreements and in their exclusionary sales

70

agreements. Varsity's "Network" gyms collectively comprise a critical source of top-level talent and fees for its All-Star competitions and the most important distribution channel for its competition All Star apparel. Varsity has created mini monopolies via these Network gyms and has assisted in the growth of these Network gyms to their advantage as the Network gyms are obligated to Varsity through perks such as free entry fees and free products given to them by Varsity.  The remainder of the All-Star gyms are offered the Family Plan, which as set forth above, impairs the ability of actual and potential rivals in both relevant markets to get access to most customers.

203. These exclusionary agreements, together with the other conduct alleged to be part of the exclusionary scheme, have blocked and impaired rivals from marketing and selling to most of the participants and customers in both the scholastic and competitive cheer markets. Varsity, together with USASF and USA Cheer, has also foreclosed competition in both the scholastic and competitive cheer markets by, inter alia, restricting access to the ability to award coveted bids to

71

Worlds and other All-Star championship bids, requiring adherence to restrictive rules and exclusionary insurance requirements, requiring mandatory attendance with Varsity camps and other conduct alleged to be part of the exclusionary scheme in this Complaint.

204. As a direct and proximate result of Varsity's exclusionary scheme, as alleged herein, Plaintiffs and their Proposed Classes have suffered antitrust injury in that they paid artificially inflated prices for goods and services that they purchased directly from Varsity in both the scholastic and competitive cheer markets during the class period. The full amount of such damages Plaintiffs and their Proposed Classes suffered will be calculated after discovery and upon proof at trial.

205. The conduct comprising Varsity's exclusionary scheme is continuing and so are the injuries and damages suffered by Plaintiffs and the Class members.

206. Defendants' exclusionary scheme has substantially foreclosed competition in both the scholastic and competitive cheer markets and allowed Varsity to obtain, maintain, and/or enhance

72

monopoly power in both markets. As a result of the exclusionary scheme, prices in both the scholastic and the competitive cheer markets have been artificially inflated above competitive levels, output in each of the relevant markets has fallen below competitive levels, and Plaintiffs and the class members have less choice in both relevant markets.

207. Due to the exclusionary scheme, Varsity has raised prices associated with All Star competitions and for All Star apparel, insurance, travel and lodging, above competitive levels and raised prices for items being purchased in scholastic sales, such as the scholastic sales items purchased by the Plaintiffs as outlined under the heading "Parties" herein above. For instance, participation fees for Varsity All Star competitions have increased substantially over the class period. Varsity also began charging spectator admission fees to JAM Brands events in 2016. Varsity has steadily increased Varsity sponsored and owned competition admission fees during the class period. In events such as JAMFest Bam JAM, admission fees for adults have doubled

73

between late 2016 and 2019, and each parent now pays a $20 spectator fee to watch his or her child perform a two minute and thirty second routine.

208.   Varsity has further exploited its monopoly power by steadily increasing the number of "Stay-to-Play" events. At a "Stay-to-Play" event, each All-Star team member is required to book lodging and stay at a Varsity-approved "Housing Partner" hotel. These "Stay-to-Play" hotels generally charge substantially more than the competitive rate charged to other guests, since the All-Star cheerleaders are a captive audience. Varsity makes significant supra-competitive profits from its Stay-to-Play program by either working with the hotels to pass a mark-up to the All-Star team members and then taking a kick-back or using Stay-to-Play to get discounted or free venues for hosting its All Star competitions. If an All-Star competition participant stays at a hotel outside the "Stay-to-Play" consortium, that participant's All-Star team is barred from participating in the All-Star competition. If Varsity learns of this rule violation after the All-Star competition, it fines the

74

All-Star gym that fielded that participant's All-Star team for the violation or disqualifies them from the competition.

209.  Varsity also used the monopoly power to gain and maintain through the scheme to charge supra-competitive prices to Plaintiffs and the Proposed Classes for All Star apparel.

210.  The exclusionary scheme has eliminated and impaired rivals in the scholastic and competitive cheer markets and blocked the entry and growth of other potential rivals. As a result, the number, size, and significance of All-Star apparel manufacturers, cheer camps and All-Star independent event competition producers (IEP's) have been reduced, and fewer people participate as All-Star cheerleaders with these non-Varsity companies. For instance, at least 35 All-Star gyms closed in 2019 as compared to a normal rate of 5 to 10 such closings in previous years.  One of the significant reasons why so many gyms are going out of business is because Varsity has assisted the big Network gyms, whom are obligated to Varsity and controlled by Varsity via free benefits, merchandise and apparel, to become mega gyms with locations

75

in several cities and states, thus squeezing out the smaller gyms that are not beholden to Varsity.  In essence, Varsity is conspiring to form mini monopolies out of a captive purchaser base of large Network gyms.

211.  During the class period, Varsity shut down many of its own All-Star competitions in addition to eliminating rival IEPs and these rivals' events. There are no legitimate procompetitive justifications or efficiencies for the conduct alleged as part of the exclusionary scheme.

### 2.    Competition All Star Apparel

212. All Star Apparel is an important aspect of All Star competitions. USASF rules govern every detail of what All Star cheerleaders may wear in a competition. Sneakers, like those Varsity manufactures and sells, are required. Skirts, briefs, and shorts must meet inseam guidelines. Exposed midriffs are forbidden for certain age groups, and tops must be secured over at least one shoulder. Bows cannot be "excessive size," jewelry is forbidden, and makeup must be "uniform and appropriate." Props such as pom poms, megaphones, and flags, also available for purchase from Varsity, are generally allowed in

76

scholastic cheer but are excluded in competition cheer and must be pre-approved by the USASF rules for competitive cheer.

213. Because of Varsity's control over the USASF, this gives Varsity an unfair competitive advantage over their apparel competitors. For instance, if the USASF should make any rule change that would affect uniforms or sneakers (example hypothetical rule change: young cheerleaders will now be allowed to show their midriff section in cheerleading uniforms), Varsity would know about this coming change at least nine (9) months ahead of their competitors, could design the uniforms and prepare their catalog with these changes, and release their catalog when the USASF announced the rule change.  Their competitors would then be caught flat footed and must quickly play catch up to their disadvantage and lost sales.  An example of this is when Varsity entered into an agreement with Swarovski.  Varsity got the USASF to change the rules to make an exception to the jewelry ban for allowance of rhinestones to be affixed to the cheerleading uniforms. Varsity then introduced a line of cheerleading uniforms, ahead of their

77

rival apparel competitors, with rhinestones attached that were purchased from their Swarovski agreement.

214. Varsity entered the All-Star apparel market in 1988. Since then, Varsity has, through its exclusionary scheme, gained an 80% share of the All-Star apparel market. As part of the scheme, Varsity has used its monopoly power in the All Star competition market to: (a) cause All Star gyms to enter into exclusive dealing agreements and rebate programs–including Varsity's Family Plan and Network Agreements– which make buying from non-Varsity All Star apparel competitors prohibitively expensive; (b) exclude All Star apparel competitors from the merchandise showrooms at their All Star competitions; and (c) acquire, and in many cases dissolve, their All Star apparel competitors.

215. As one recent article states, "Thanks to an aggressive campaign of acquisitions, rebate plans that make it expensive for gym owners to switch suppliers, and other strategies, Varsity Spirit, the corporation's cheer division, commands north of 80 percent of the uniform market, as estimated by competitors. The company also wields

78

outsize influence in virtually every aspect of the industry, including the camps and most important, the competitions, which also serve as merchandise showrooms for apparel vendors."

## B.   Markets Under Varsity's Control

216.   Varsity Brands, through its network of subsidiaries BSN Sports (sporting goods and equipment), Varsity Spirit (all things cheerleading), Stanbury (band, color guard), Varsity Intropa Tours, LLC, Herff Jones (rings, yearbooks, graduation announcements with caps and gowns) and their Impact Program (construction and re-branding of school image and mascot) has closed out all competition from their competitors in the scholastic market and severely limited their competitors in the competition All Star market.   Competition suffered as a result harming prices, output, and/or the quality of goods in all the relevant markets causing the Plaintiffs injuries.   In some cases, the Defendants offered goods at below production costs of such goods to it's customers, such as offering free sneakers to a gym or school, in order to quash the competition who could not compete with free goods.

217.  Varsity admits to this scholastic monopoly and brags about it in their marketing.  For instance, within the last year Varsity Spirit sent a marketing material to all school coaches stating "WE ARE SPIRIT…..We fuel the passion and spirit found in **every** high school across America, on **every** sideline, in **every** halftime show, of **every** season.  We are Varsity and we are spirit" (see Exhibit "B").

## 1.    The Cheer Competition Market

218.  Now to defining the "Cheer Competition Market."  The Cheer Competition Market comprises the market for competitive cheerleading.  This market consists of revenue derived from competitions, travel, hotels, choreography, coaches educational/certification seminars, music, uniforms, warmups, backpacks, sneakers, insurance, camps, bows, makeup, cheer merchandise and admission fees to competitions.  The geographic reach of this market is nationwide.  Today, the Cheer Competition Market generates multiple millions in annual revenues.  Of those revenues, Varsity reaps more than 80% of the market, a substantial share.  In competition for that revenue are competitors

80

including Plaintiffs. The competition for the Cheer Competition Market is substantially lessened, however, due to Varsity's monopolistic activity.

219. To maintain control over the Cheer Competition Market, Varsity bought up most of their competition, developed monopolistic tactics, such as exists in their insurance plans, required attendance at one of their camps as a prerequisite for attending one of their competitions, have control over the end of season bids, control through their rebate "family plan" and "Network" programs and with other similar type activity. Those techniques, negatively affecting hundreds of thousands of purchasers, involved both use of the U.S. Mail service and transmission of signals via wire, radio, or television, including Varsity TV (which they own), in interstate commerce. Indeed, Varsity used the U.S. Mail and such electronic communications to further their conspiracy to monopolize. In time, Varsity's techniques proved effective.

**2.    The College, High School, Junior High School, and Recreational Cheer Market**

220. It also entered the "College, High School, and Junior High School Cheer Market." This Market comprises the market for college,

high school, junior high school and recreational sideline cheerleading along with regional, state, and national competitions in the field of cheerleading. This market consists of revenue derived from competitions, choreography, uniforms, pom poms, cheer bows, megaphones, water bottles, sneakers, backpacks, cheer merchandise, insurance, camps, coaches educational/certification seminars, and admission to competition fees. The geographic reach of this market is nationwide. Today, the College, High School, Junior High School and Recreational Cheer Market generates multiple millions in annual revenues. Of those revenues, Varsity reaps more than 90% of the market, a substantial share. In competition for that revenue are competitors including Plaintiffs. The competition for the scholastic cheer competition market is substantially lessened, however, due to Varsity's monopolistic activity.

221. To maintain control over the College, High School, and Junior High School and Recreational Market, Varsity developed monopolistic tactics, required use of their choreography services along with attendance at one of their camps as a prerequisite for attending most of the state or national competitions, and other similar type activity. In all, hundreds of schools—comprising hundreds of thousands

of affected purchasers—throughout the nation entered such exclusive dealing contracts with Varsity.  As a showing of proof, a few examples of such exclusive school contracts were those entered into between Varsity and Tulane University with a multi-year agreement; Wissahickon School District in Ambler, Pa.; Largo High School in Holiday, Fl.; Okmulgee Public Schools; Chisholm Public Schools in Enid, Ok.; Akins High School in Austin, Tx.; and El Toro High School in Memphis, Tn.

222.  Moreover, Varsity's techniques involved both use of the U.S. Mail service and transmission of signals via wire, radio, or television, including Varsity TV (which they own), in interstate commerce.  Indeed, Varsity used the U.S. Mail and such electronic communications to further their conspiracy to monopolize.  Over time, Varsity's techniques proved effective.

### 3.   The College, High School, and Junior High School Athletic Equipment Market

223.  Similarly, Varsity entered the "College, High School, and Junior High School Athletic Equipment Market."  The College, High School, and Junior High School Athletic Equipment Market comprises

the market of all sports equipment and uniforms associated with football, basketball, volleyball, track, wrestling, lacrosse, cheerleading, soccer, and rebranding of the schools' image and mascot called the Impact Program by Varsity. The geographic reach of this market is nationwide. Today, the College, High School, Junior High School and Recreational Athletic Equipment Market generates multimillions in annual revenues. Of those revenues, Varsity reaps more than 90%, a substantial share. In competition for that revenue are competitors including American Spirit and Cheer Essentials, Inc. and Rockstar Championships, LLC. The competition for the College, High School, Junior High School and Recreational Athletic Equipment Market is substantially lessened, however, due to Varsity's monopolistic activity.

224. To maintain control over the College, High School, Junior High School and Recreational Athletic Equipment Market, Varsity offers perks such as free school rebranding, one-stop-shop services, in exchange for school commitments and agreements to purchase exclusively from Varsity, which bars their competitors from those schools. In all, hundreds of schools, comprising hundreds of thousands of affected purchasers, throughout the nation entered such exclusive dealing contracts with Varsity.

84

225. To further a school's commitment to Varsity, Defendants came up with the Varsity School Spirit Awards program which is nothing but a glorified and conspired sales payola type activity (Payola has come to mean the payment of a bribe in commerce and in law to say or do a certain thing against the rules of law, but more specifically a commercial bribe). Varsity claims that this program is to honor the very best of America's high schools by recognizing outstanding schools, organizations and individuals that go above and beyond to build school pride, student engagement and community spirit. This was Varsity's way to butter up, commit and reward the school principals and school athletic directors who do the most business with Varsity by giving them a free, all-expense paid vacation to Disney World and to give out awards to these school representatives to obtain their loyalty and to seal their commitment to Varsity. The recipients of these awards ($100,000.00 in awards each year per their web site) are nominated by their Varsity sales representative and are voted on and selected by the Varsity marketing department.

226. Moreover, Varsity's techniques involved both use of the U.S. Mail service and transmission of signals via wire, radio, or television in interstate commerce. Indeed, Varsity used the U.S. Mail and such

electronic communications to further their conspiracy to monopolize. Over time, Varsity's techniques proved effective.

### 4. The College, High School, and Junior High School Graduation Regalia Market

227. Further, Varsity entered the "College, High School, and Junior High School Graduation Regalia Market" through its purchase of Herff Jones, LLC. The College, High School, and Junior High School Graduation Regalia Market comprises the market for school rings, championship rings, yearbooks, caps and gowns, and graduation announcements. The geographic reach of this market is nationwide. Today, the College, High School, and Junior High School Graduation Regalia Market generates multimillions in annual revenues. Of those revenues, Varsity reaps more than 90%, a substantial share. In competition for that revenue are U.S. competitors. The competition for the College, High School, and Junior High School Graduation Regalia Market is substantially lessened, however, due to Varsity's monopolistic activity.

228. To maintain control over the College, High School, and Junior High School Graduation Regalia Market, Varsity offers perks such as free school rebranding and one-stop-shop services in exchange

86

for school commitments and agreements to purchase exclusively from Varsity, which bars their competitors from those schools.   In all, hundreds of schools, comprising hundreds of thousands of affected purchasers, throughout the nation entered such exclusive dealing contracts with Varsity.   Moreover, Varsity's techniques involved both use of the U.S. Mail service and transmission of signals via wire, radio, or television in interstate commerce.  Indeed, Varsity used the U.S. Mail and such electronic communications to further their conspiracy to monopolize.  In time, Varsity's techniques, following the model, did the trick.

**5.    The Cheer Camp Market**

229.   Finally (for the scope of this lawsuit) Varsity developed and maintained control of the "Cheer Camp Market." The Cheer Camp Market comprises the market for both competitive and scholastic cheerleaders.   The geographic reach of this market is nationwide. Varsity has made it a requirement for scholastic cheerleading teams to attend one of their Varsity sponsored summer camps as a prerequisite to competing in most school state and national championships.   In addition, Varsity has their own division of choreographers called Pure Choreography, and these choreographers know ahead of time during

87

these camps about any scoring changes that Varsity has made on their scoring sheets utilized at competitions which gives the Varsity choreographers an unfair advantage over the independent choreographers. Today, the Cheer Camp Market generates multimillions in annual revenues. Of those revenues, Varsity reaps more than 60%, and over 90% of the residential overnight camp business, a substantial share. In competition for that revenue are competing camp providers including Plaintiff Jeff and Craig Camps. The competition for the Cheer Camp Market is substantially lessened, however, due to Varsity's monopolistic activity. Varsity, through its control of the scholastic governing authorities, has implemented a rule of mandatory attendance in one of the Varsity sponsored and Varsity run camps as a prerequisite for admission into the state or national scholastic cheerleading competitions.

230. To maintain control over the scholastic market, Varsity has schools commit through their exclusionary sales agreements, which bars their competitors from those schools. In all, tens of thousands of affected purchasers throughout the nation, in the form of parents of students and taxpayers paying for Varsity Brands equipment, apparel and merchandise, have been negatively affected. Moreover, Varsity's

88

techniques involved both use of the U.S. Mail service and transmission of signals via wire, radio, or television in interstate commerce.  Indeed, Varsity used the U.S. Mail and such electronic communications to further their conspiracy to monopolize.  In time, Varsity's techniques, following the model, performed as planned.

## C.    How Varsity Monopolizes

231.  For example, the scholastic business consists of all things that a college, high school or junior high school would need for athletics, cheerleading, or graduation regalia.  Items that school and parents purchase in this scholastic class are uniforms and sports equipment needed for football, basketball, wrestling, soccer, golf, baseball, track, lacrosse, softball, or cheerleading.  This scholastic business also includes graduation paraphernalia such as graduation announcements, class rings, yearbooks along with caps and gowns.  Varsity has cornered this market through Varsity Brands, Varsity Spirit, BSN, Stanbury, Herff Jones and its Impact Program sales techniques of exclusionary contracts with schools and its one-stop-shop sales pitches.  Varsity currently has

89

a 90% share of this scholastic market and through their monopolistic maneuvers has locked out most competition for these types of sales.

232. Similarly, consider competitive cheerleading. Competitive cheerleading has emerged into a multi-billion-dollar sport with over four (4) million cheerleading participants across the United States. Varsity puts on over 800 cheerleading competitions across the United States annually. These Varsity competition events attract over 900,000 cheerleading participants from independent gyms and schools. Jeff Webb was an Oklahoma College cheerleader and founded Varsity in 1974 (History above). Varsity has, through its anti-competitive scheme in both the competitive cheerleading and the scholastic cheerleading market (described herein above), implemented business decisions favorable to Varsity in combination with its sponsorship and control over the USASF, AACCA, USA Cheer, ICU and NFHS (governing boards for competitive and scholastic cheerleading) causing them to gain and maintain significant control of every aspect of the scholastic and competitive cheerleading market while blocking or downplaying their

90

competitors' ability to compete in these markets.

233. Cheerleading is a costly activity for the parents of these cheerleaders. A single season of competitive cheer costs a parent between $3,000 and $7,000 per cheerleader and approximately $900.00 to $1,200.00 per scholastic cheerleader (scholastic cheerleaders usually only compete in regional, state and national competitions whereas the competitive cheerleader competes in six or more competitions per year).

During the school season the scholastic cheerleader is involved in sideline cheerleading for their school teams, but they also develop routines for regional, state and national competition that involves tumbling, dancing and pyramids. All Star cheerleaders are associated with a privately owned gym that has several competitive cheerleading teams in different classes or levels of cheerleading, and compete with other gyms at local, state, national and world competitions with tumbling, dancing, and pyramid skills.

234. Plaintiffs claim that the conduct described herein violated, and continues to violate, Section 2 of the Sherman Antitrust Act, and

that it and the members of the proposed Class were and continue to be injured by paying artificially inflated prices directly to Varsity for cheerleading and scholastic apparel and other merchandise. Plaintiffs seek equitable relief to stop Defendants' continuing anti-competitive conduct and to recover money damages for injuries in the form of paying artificially inflated prices to Varsity incurred because of Defendants' anti-competitive conduct alleged herein.

235. Over the past 4 years and previously, Varsity has, in combination with USASF, along with their undue influence and control over the AACCA, USA Cheer, ICU and the NFHS (National Federation of High Schools) acquired, enhanced and maintained monopoly power in both the competitive cheerleading market and the scholastic apparel and other school merchandise market conducted in the United States through an unlawful scheme consisting of exploiting its substantial market power in the relevant markets to, without limitation:

(a) impair and then buy up any actual or potential rivals that could possibly threaten Varsity's dominance in the relevant

92

markets, including acquisitions of Varsity's biggest competitors (and many of its smaller rivals) as well as several apparel, independent event producers and camp competitors.

(b)    deploy its monopoly power in the primary competitive cheer market to impose exclusionary agreements or terms on gyms, causing these gyms to agree, on their own behalf and on behalf of their members and parents, to patronize Varsity exclusively through exclusive sales agreements or making a gym commit to all Varsity related business activities in the primary competitive cheer market as well as in the scholastic market.

(c )    in order to participate and to pay registration fees for the most prestigious two day competitions, Varsity engaged in tying activities by compelling parents of cheerleaders to also purchase hotel rooms (Stay to Play) through Varsity (Intropa Tours) as a requirement for participating in the Varsity competition.

In the competitive cheer market these agreements or terms (i) directly require the largest, highest sale volume competition All

93

Star gyms with the top cheerleaders and teams, necessary to put on successful All Star competitions, to purchase competition cheer apparel exclusively from Varsity and to fill the limited number of events comprising their competition season schedule with Varsity sponsored and run All Star competitions, to the exclusion of other independent event producer All Star competitions and their competition All Star apparel companies; and (ii) condition the avoidance of paying penalty prices for goods and services in the competitive All Star competitions and competition All Star apparel markets on exclusive or near exclusive patronage of Varsity in both the competitive and scholastic markets; and

(d)     Varsity leverages its control of the cheerleading governing bodies, including USASF, AACCA, ICU, USA Cheer and the NFHS to impair actual and potential rivals directly in the primary market and indirectly in the ancillary market, forcing many potential rivals out of business or relegating them to a minor status in the markets.

94

236.   Varsity continued a series of acquisitions that, together with other conduct alleged herein, allowed it to dominate the competitive All-Star cheer and scholastic market. Varsity's systematic and continuing acquisition of competitive cheer and scholastic apparel and merchandise rivals, combined with one or more of the other anti-competitive conducts alleged herein, has allowed it to acquire, maintain and enhance control over all major championships of consequence including the CheerSport competition held yearly in Atlanta, Georgia, the Cheerleading World Championship held at Disney World in Florida known simply as "Worlds", The Summit and the U.S. Finals.

237.   Varsity has used its control of the competitive cheer and scholastic markets to acquire, enhance, and maintain monopoly power in the markets by impairing and/or excluding actual and potential apparel, camp and independent event production rivals through the exclusionary scheme alleged herein.   The competitive cheer and scholastic competitions and conventions are, in part, market-dominant trade shows, and Varsity forbids or severely restricts its apparel, camp

95

and independent event production rivals from displaying wares in those competition and scholastic convention events limiting the vendors exclusively to Varsity owned vendors.

238.   It is pointed out that there are limited venue arenas that can hold a cheerleading competition due to the height requirement for the safety of the cheerleading athletes.   It is pointed out that most school gymnasiums will not rent out their gyms for competition cheerleading for liability and insurance issues.  Varsity has made a habit, when they book a venue arena to include a restriction or non-compete clause that restricts the arena from renting to any cheerleading competition independent event producer, during the competition season which limits the number of event venues available for any of Varsity's competing independent event producers (IEP's).  In order to dominate a particular geographic area, Varsity at the beginning of the season through a company called CMS will buy up all the venues and hold Varsity competitions, via contracts with non-compete clauses, and exclude all competitor event producers from the available event venues in that

96

geographic area.  CMS is a company that handles renting out large venues for most of the large venue arenas in most states and Varsity meets with them each year, has a list of competitor events supplied to them by USASF, and books most of the available venues ahead of their competing independent event producers (IEP's).  This severely limits these IEP's from competing with Varsity in the marketplace for booking competitions.

239.  Moreover, Varsity rewards competition gyms that purchase Varsity's apparel and merchandise for their competition All Star cheerleaders to use in Varsity's market dominant competitions, with a monetary rebate program given to each gym on a yearly basis.  Varsity enters into "Family Plan" and "Network" agreements with competition gyms requiring the gym to purchase Varsity apparel, attending their camps and competitions.

240. This rebate program gives gyms points for purchasing everything Varsity sells such as apparel, merchandise, camps, insurance, travel accommodations, and competitions.  The more a

97

competition gym buys from Varsity, the more Varsity points the gym gets, which correlates into the amount of the financial rebate check that the competition gym gets on a yearly basis.  This rebate check (payola kickback) is delivered to the competition gym during the slow months in the gym business which is between the end of the previous competition year schedule and the beginning of the next season.  This rebate program is given to the gym and not to the parents of the cheerleaders, who actually paid for the services and items, which encourages loyalty from the gyms to Varsity to continue to purchase their products and services.  Again, if it looks like a bribe, smells like a bribe, walks like a bribe…..then it must be a payola type payment or bribe (kickback) to gain an upper hand in the commercial market.

241. Additionally, given that Varsity's competitions are the dominant events and comprise the majority of the All-Star teams' schedule, and that it would be prohibitively expensive for most participants to purchase multiple competition uniforms for a season, Varsity's rule over competing sellers of competition cheer All Star

apparel has a powerful exclusionary effect.  Varsity's conduct and rules block rivals from both a key marketing channel which comprises the main, if not the only reason, competition cheerleading All Star gyms buy All Star apparel in the first place, for use at All Star competitions.

242.  Further, Varsity employs two types of exclusionary contracts with competition cheerleading All Star gyms, which it calls the "Network Agreement" and the "Family Plan," to maintain its dominance in the All Star competition market and to acquire, enhance, and maintain monopoly power in the All Star apparel market.  Varsity focuses its exclusionary conduct on All Star gyms because these gyms recruit, train, organize, and maintain All Star competitive cheerleading teams.  The All-Star gyms also select the All Star competitions and camps to attend and make purchasing decisions regarding the All Star apparel to be used by their competitive cheerleading teams.  As such, All Star gyms are a key input for producing a successful All-Star competition and the primary and necessary distribution channel for competitive cheerleading All Star apparel.

243. Varsity imposes its most exclusionary contracts, called Network Agreements, on the big-money and most prestigious All-Star gyms whose attendance is critical to putting on successful All Star competitions and a key distribution channel for All Star apparel. Under these Network Agreements, the All-Star gyms are required to commit to near exclusive attendance at Varsity sponsored All Star competitions and camps with complete exclusive patronage by the gyms and their team members of All Star apparel. Varsity also imposes restrictive terms on all of the other All-Star gyms through the Family Plan, which makes access to non-penalty prices on All Star competitions and All Star apparel contingent on All Star gyms attending Varsity sponsored choreography camps and All Star competitions for the vast majority of their seasons, and purchasing the vast majority of their and their members' All Star apparel requirements from Varsity.

244. During the four-year class period (in this petition), Varsity collectively controlled approximately 90% of the All Star competition market, 80% of the All Star apparel market, and 90% of the scholastic

market.  Varsity has used its dominant market power in the relevant markets to substantially foreclose competition in all these markets and thereby maintain and enhance its dominance in all of these markets.  In so doing, Varsity's exclusionary scheme has led to reduced output, supra-competitive prices, and reduced choice in all these relevant markets.  During the period relevant to this case, for instance, the number and variety of All Star competitions have fallen, the number of rivals in both relevant markets has dropped, and prices in these markets have risen.

245.  Varsity has also concocted a similar exclusionary scheme in the scholastic market. Varsity has purchased all the companies needed to corner the scholastic athletic, cheer, and graduation merchandise market.  They then, through their sales staff, approach schools with their "one-stop-shop" approach informing schools that instead of dealing with several different companies to purchase scholastic cheerleading, athletic and graduation merchandise, they can purchase everything from Varsity, and they will offer a re-branding of the school

101

image/mascot/scoreboards in exchange for an exclusive sales agreement for a period of years, thus blocking the market from Varsity's competitors. These exclusionary agreements, known as the "IMPACT" program agreements, are very similar to the "Network" agreements described herein above and contain similar discount and rebate type activity. Hundreds, if not thousands of schools have entered into these exclusionary school agreements with Varsity nationwide before and during the class period.

246. During the four-year class period (in this petition), Varsity collectively controlled approximately 90% of the scholastic competition market. Varsity has used its dominant market power in the relevant scholastic market to substantially foreclose competition in the scholastic market and thereby maintains a dominance in the scholastic market. In so doing, Varsity's exclusionary scheme has led to reduced output, supra competitive prices, and reduced choice in the scholastic market. During the period relevant to this case, for instance, the number of rivals in the scholastic relevant market has dropped, and prices have

102

risen.

247.  Today, Varsity describes itself as "the worldwide leader in cheerleading...apparel, educational camps, and competitions" and a leader in uniform innovation, as well as educational camps, clinics and competitions, impacting more than a million athletes each year. Varsity's exclusionary enterprise scheme, as alleged herein, is intentional and systematic.  As Varsity's founder, Defendant Jeff Webb stated in a recent interview:

> "**[W]e were positioning ourselves to provide all the products and services that the affinity group [All-Star Cheer participants] utilized.** Not only did we have the number one position in those three segments [competitions, apparel, and camps], but then we developed a cross-marketing model where we could promote [the segments within each other] and to be honest with you, it took off."

248.  As a direct and proximate result of Varsity's unlawful and anti-competitive Exclusionary Scheme, Plaintiffs and the Proposed Classes (defined below) have paid higher prices for competitions, apparel, cheerleading camps, athletic equipment, and related goods and services bought directly from Varsity than they would have paid in a

competitive marketplace absent the exclusionary scheme, and have thereby suffered, and continue to suffer, antitrust injury.

## D. Scope of Varsity's Monopoly Power

### 1. Monopolistic Market Shares

249. Thus, Varsity tightened control over the markets defined above, collectively "the relevant markets." Indeed, it employed the unfair methods described above to unreasonably restrain trade, substantially lessen competition, and tended to produce monopolies in the relevant markets with the following results:

> (a) Cheer Competitions Market comprises the nationwide market for competitive cheerleading.
>
> Varsity controls over 80% of this market.
>
> (b) College, High School, Recreational and Junior High School Cheer Market, comprises the nationwide market for college, high school, recreational and junior high school sideline cheerleading along with regional, state, and national competitions in the field of cheerleading.
>
> Varsity controls over 90% of this market.

  (c)  The College, High School, and Junior High School Athletic Equipment Market comprises the nationwide market of all sports equipment and uniforms associated with football, basketball, volleyball, track, wrestling, lacrosse, cheerleading, soccer, and rebranding of the schools' image and mascot called the Impact Program by Varsity.

  Varsity controls over 90% of this market.

  (d)  The College, High School, and Junior High School Graduation Regalia Market comprises the nationwide market for school rings, yearbooks, caps and gowns, and graduation announcements.

  Varsity controls over 90% of this market.

  (e)  The Cheer Camp Market comprises the nationwide market for both competitive and scholastic cheerleaders.

  Varsity controls over 60% of this market and 90% of all residential overnight camps.

**2.  Period of Control**

250. For the purposes of simplicity, and even though Varsity's activity spans many decades, the Plaintiffs and their Classes sue only for damages incurred in the relevant markets over the "Class Period" from four years from the filing of this complaint until the continuing Exclusionary Scheme alleged herein ends.

**3.      Varsity's Exclusionary Practices Tending Towards Monopoly**

251. As outlined above, Defendants' "Exclusionary Practices" which unfairly impacted trade include:

1.      Plaintiff American Spirit and Cheer Essentials, Inc. has been excluded from many college, high school, recreational and junior high schools due to the exclusive sales agreements between Varsity and hundreds of schools.  The exclusivity business model and exclusive sales contracts that Varsity has implemented with gyms and schools has impacted their business and other non-Varsity apparel companies through lost sales and lost markets otherwise available in the apparel customer market. See Affidavit of Heidi Weber attached as Exhibit "A" to Plaintiffs original Complaint (ECF No. 1).

106

2. Rockstar Championships, LLC is an independent event producer [IEP] who has lost business and had the competition event business curtailed due to being excluded from the competitive market through Varsity and USASF's monopolistic actions of requiring gyms and schools to only attend Varsity sponsored competitions through their reward "bids" type program of business.

3. Jeff & Craig Cheer, LLC, d/b/a Jeff and Craig Camps have been excluded and lost profits through Varsity's monopoly policy of requiring school cheerleaders to attend only Varsity sponsored camps as a prerequisite to going to the state or national championships. They have also lost business through Varsity's monopoly policy of requiring cheerleading teams from competition gyms to attend only a Varsity sponsored camp as a prerequisite to competing in the Varsity sponsored competitions [Worlds, The Summit, and the U.S. Finals].

4. The Plaintiffs Mark & Kathleen Lukens, and Ashley Haygood are the parents of students and cheerleaders who are involved in both competitive All Star and school

107

cheerleading and have purchased other scholastic merchandise and apparel as outlined under the topic entitled "Parties" herein above. Due to Varsity's monopolistic activities, they have paid enhanced prices for the services, apparel and merchandise and received absolutely no rebate benefit that Varsity pays to the competition gyms.

### 4. Harm to Plaintiffs

252. During the Class Period, Varsity's exclusionary practices and monopolistic share of the relevant markets enabled it to set prices uncontrolled by the competitive conditions which would exist in a free market. Moreover, Varsity's monopolistic share of the relevant markets allowed Varsity to exclude actual and potential competitors. Consequently, the Plaintiffs and their Proposed Classes are due remuneration for their losses.

253. The same harm suffered by Plaintiff American Spirit and Cheer Essentials, Inc. and the Apparel Class was suffered by all apparel companies competing with Varsity in the market. The amount of remuneration due each Plaintiff in this class may be established by awarding this class of plaintiffs an amount equivalent to 20% of Varsity's apparel sales [net profits after expenses] for the Class Period.

254. The same harm suffered by Plaintiff Rockstar Championships, LLC was suffered by all independent production companies who put on competition cheerleading events. The amount of remuneration due each Plaintiff in this class may be established by awarding this class of plaintiffs an amount equivalent to 20% of Varsity's competition sales [net profits after expenses] for the Class Period.

255. The same harm suffered by Plaintiff Jeff & Craig Cheer, LLC, d/b/a Jeff and Craig Camps was suffered by all independent camp production companies who put on cheer camps. The amount of remuneration due each Plaintiff may be established by awarding this class of plaintiffs an amount equivalent to 20% of Varsity's camp sales [net profits after expenses] for the Class Period.

256. The same harm suffered by Plaintiffs Mark & Kathleen Lukens, and Ashley Haygood was suffered by any parent who has purchased competition entry fees, competition admission fees, purchased travel accommodations, insurance, purchased both competitive and scholastic cheerleading uniforms, paid for cheerleading camps, and scholastic apparel or merchandise, marketed by Varsity at Varsity's monopolistic escalated prices. The amount of remuneration

due each Plaintiff class member may be established by awarding each class member a monetary amount calculated at $250.00-$1,000.00, based on whether it's competitive cheer or scholastic apparel or merchandise, as produced in the evidence, for the difference between the competitive price from a non-Varsity competitor that sells these items or services and the inflated monopolistic costs charged by Varsity.

## V.    INTERSTATE TRADE AND COMMERCE

257. Varsity's anticompetitive and unlawful conduct as alleged herein has taken place in and affected the continuous flow of interstate trade and commerce in the United States.    Indeed, Varsity has negatively impacted interstate trade by:

(a)    advertising;

(b)    selling; and

(c)    foreclosing competition

in the relevant markets throughout the United States, including in this District.  Many of the Defendants competitions, such as CheerSport, NCA, Worlds, Summit, UCA and Universal Dance attracted competitors from all over the entire United States and these competitors attended Varsity sponsored camps and purchased goods and services from the

Defendants throughout the entire geographical area of the United States.

258. The exclusionary practices Varsity used to foreclose competition in the relevant markets affected billions of dollars of commerce. Indeed, during the class period, Plaintiffs, and their classes collectively paid hundreds of millions of dollars directly to Varsity for purchases of goods and/or services in the relevant markets.  In doing so, Plaintiffs and their classes paid supra-competitive prices; prices higher than those that would exist in a market where Varsity had not foreclosed competition.  Thus, Varsity inflicted antitrust injury.

## VI.   CLAIMS

259. The acts of the enterprise and conspiracy alleged against Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, including Defendant Jeff Webb during the class period, while actively engaged in the management and operation of Defendants' business or affairs.

260. Various persons and/or firms not named as defendants herein may have participated as co-conspirators in the exclusionary scheme alleged herein and may have performed acts and made statements in furtherance thereof.  Plaintiff reserves the right to name some or all  of  these  persons  as defendants at a later date.

261.  At all times relevant to this Complaint, Varsity through its influence upon the USASF and USA Cheer, conspired to facilitate Varsity's monopolization of the relevant markets.  Varsity, through its control over the USASF got USASF to promulgate rules with the purpose of reducing competition in the market and increasing  Varsity's monopoly power.

262.  Whenever in this Complaint reference is made to any act, deed, or transaction of any corporation, the allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were  actively  engaged  in  the  management,    direction,  control,  or transaction of the corporation's business or affairs.

112

263. Each defendant acted as the principal, agent, or joint venturer of, or for, other defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiffs.

264. Individuals alleged to have engaged in misconduct in violation of the federal laws listed herein are alleged to have done so on behalf of all members of their corporate family, i.e., Varsity. Individuals within the companies and customers did not know or did not distinguish between the corporate affiliations of different individuals. Varsity Brands, Varsity Spirit, Herff Jones, Varsity Brands Holding, Varsity Intropa Tours, and Varsity Spirit Fashion all affirmatively and collectively represent themselves as one corporate family, rather than separate subsidiaries and parents. For instance, and without limitation, the Varsity Brands website states "WE ARE . . . Varsity Spirit."

265. Plaintiffs and their classes incorporate by reference all the preceding and ensuing paragraphs as if fully alleged herein, and charge Defendants with the following:

## A. Creating Illegal Restraints of Trade in Violation of 15 U.S.C. § 1

266.  Defendants made contracts in restraint of trade among the several States.

## B. Monopoly Making in Violation of 15 U.S.C. § 2

267.  Defendant Varsity monopolized or attempted to monopolize with another person to monopolize part of the trade or commerce among the several States.  Defendant Varsity has attempted and created a monopoly power in the markets described herein above; have obtained or maintained the monopoly through willful anticompetitive conduct; and caused rising prices in the herein described marketplace. Defendant Varsity through their anti-competitive attempts have shown a pattern of specific intent to monopolize.  Defendant Varsity has dominated the markets described herein above through their anticompetitive conduct by (1) acquiring Independent Event Producers, (2) set up exclusionary apparel contracts, and (3) Interacted with co-Defendant U.S. All-Star Federation to exclude competitors.

## C. Making of Agreements Not to Use the Goods of Competitors in Violation of 15 U.S.C. § 14

268. Defendants in the course of being engaged in commerce, made sales or contracts in restraint of trade, for sales of goods, wares,

merchandise, or other commodities within the United States (or fixed a price charged therefor or discount from or rebate upon such price) on the condition, agreement, or understanding that the purchaser thereof shall not use or deal in the goods wares merchandise or other commodities of a competitor or competitors of the seller with the probable effect of substantially lessening competition or tending to create a monopoly in the following lines of commerce:

(a)   The nationwide market for competitive cheerleading including competitions.

(b)   The nationwide market for recreational, college, high school, and junior high school sideline cheerleading along with regional, state, and national competitions in the field of cheerleading.

(c)   The nationwide market of all sports equipment and uniforms associated with football, basketball, volleyball, track, wrestling, lacrosse, cheerleading, and soccer.

(d)   The nationwide market for school rings, yearbooks, caps and gowns, and graduation announcements; and

(e)   The nationwide market for cheer camps.

115

By doing so, Defendants actions, including Defendant Webb's active engagement in the anticompetitive scheme, foreclosed competition on a substantial share of the relevant markets.

269. Consequently, Plaintiffs and their proposed classes are due remuneration from all Defendants in accordance with law.

## VII.   CLASS ALLEGATIONS

270. One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

(1)    the class is so numerous that joinder of all members is impracticable.

(2)    there are questions of law or fact common to the class.

(3)    the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4)    the representative parties will fairly and adequately protect the interests of the class.

271. The Plaintiffs bring this action on behalf of themselves and as proposed class representatives in a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, seeking

equitable and injunctive relief, as well as damages, on behalf of the

following classes:

(a)   Independent Event Production Class—All natural

persons or entities in the United States that have

directly suffered due to Varsity's monopolistic

activities as hereinabove described, who have suffered

in the form of a loss of the share of the market in the

business of competition event productions during the

class period for the last four years prior to the date of

the filing of this complaint.  This Plaintiff Class has lost

the equivalent of a sum in excess of a 20% share of the

business of competition event productions.

(b)   Competitive, College, High School, and Junior High

School Parent Class—All natural persons or entities in

the United States that directly or indirectly paid

Varsity or any wholly or partially owned Varsity

subsidiary during the class period for the last four

years prior to the date of the filing of this complaint

that have paid Varsity enhanced fees for uniforms,

117

athletic equipment, competition fees, event admission fees, camp fees, insurance, travel and accommodation fees, school paraphernalia such as class rings, yearbooks, graduation caps and gowns or graduation announcements, or merchandise. These enhanced fees will be determined through the evidence at trial by comparing competitors' merchandise or services and pricing to those charged by Varsity.

(c) The Cheer Camp Market Class—All natural persons or entities in the United States that lost a share of the scholastic and competition cheerleading camp market that have directly suffered due to Varsity's monopolistic activities as hereinabove described, who have suffered in the form of a loss of the share of the market in the business of scholastic and competition cheer camps during the class period for the last four years prior to the date of the filing of this complaint. This Plaintiff Class has lost the equivalent of a sum in excess of a 20% share of the business of the scholastic and competition cheer camp market.

118

(d)   Apparel, Athletic Equipment and Merchandise Class [both competitive and scholastic]—All natural persons or entities in the United States that have directly suffered due to Varsity's monopolistic activities as hereinabove described, who have suffered in the form of a loss of the share of the market in the business of apparel, athletic equipment, and cheer merchandise during the class period for the last four years prior to the date of the filing of this complaint.  This Plaintiff Class has lost the equivalent of a sum in excess of a 20% share of the business of apparel, athletic equipment, and cheer merchandise sales.

272.  Excluded from each Class are Defendants, their parent companies, subsidiaries, affiliates, franchisees, officers, executives, and employees; any entity that is or has been partially or wholly owned by one or more Defendants or their respective subsidiaries; States and their subdivisions, agencies, and instrumentalities; and any judicial officer presiding over this matter and his or her staff.

273.  While Plaintiffs do not know the exact number of members in each class, there are many, more than forty and in some of the classes there are hundreds—or hundreds of thousands—of members in each class.   Moreover, those members are geographically dispersed throughout the United States.

274.  Common questions of law and fact exist as to all members of each class. Defendants' anticompetitive exclusionary scheme commonly implicated and was generally applicable to all the members of each class, thereby making class-wide adjudication and relief appropriate. Such questions of law and fact common to each class include, but are not limited to:

(a)  whether their corresponding markets as defined above are the appropriate and relevant markets for analyzing the claims in this case.

(b)  whether the relevant geographic market is the United States.

120

(c)     whether Varsity possesses monopoly power in the relevant markets.

(d)     whether Varsity willfully acquired, maintained, and/or enhanced monopoly power in the relevant markets.

(e)     whether Varsity engaged in overt acts furthering their conspiracy to maintain and enhance Varsity's dominance in the relevant markets.

(f)     whether Varsity engaged in unlawful exclusionary conduct to impair the opportunities of actual or potential rivals in the relevant markets and thereby foreclosed substantial competition in those markets.

(g)     whether Varsity's exclusionary scheme maintained or enhanced Varsity's monopoly power in one or more of the relevant markets.

(h)     whether Varsity's exclusionary scheme violated Section 2 of the Sherman Act, 15 U.S.C. § 2.

121

(i)    whether Varsity's exclusionary scheme had anticompetitive effects in one or more of the relevant markets.

(j)    whether Varsity's actions alleged herein caused injury to Plaintiff and the class members by causing them to pay artificially inflated prices in the relevant markets during the class period.

(k)    whether Varsity and USASF and/or USA Cheer assisted Varsity in maintaining and/or enhancing dominance in the relevant markets.

(l)    whether Varsity and USASF and/or USA Cheer engaged in overt acts in restraint of trade which maintained and enhanced Varsity's dominance in the relevant markets.

(m)    the appropriate measure of damages; and

(n)    the propriety of declaratory and injunctive relief.

275. The members of each class are so numerous and geographically dispersed that joinder of all members is impracticable. Although the precise number of such individuals, organizations, and

122

businesses is currently unknown, Plaintiff believes that the number of members in each class numbers in the hundreds to hundreds of thousands.  Moreover, the members of each class reside or are located throughout the United States, including in this District.

276.  Each class representative's claims are typical of those of the class it seeks to represent. Each class representative, like all other class members, has been injured by Varsity's exclusionary scheme and Varsity's illegally obtained monopoly power that resulted in artificially inflated prices in the relevant markets.

277. Each class representative is a more than adequate representative of the class, and its chosen class counsel (the undersigned) are more than adequate attorneys. Each class representative has the incentive, and is committed to prosecuting this action, for the benefit of their corresponding classes. No class representative has an interest that is antagonistic to those of its corresponding class. Each class representative retained counsel highly experienced in antitrust and class action litigation.

278.   This action is maintainable as a class action under Fed. R. Civ. P. 23(b)(2) because Varsity acted and refused to act on grounds that apply generally to each class, and final injunctive and declaratory relief is appropriate, and necessary, with respect to each class.

279.   This action is maintainable as a class action under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to each class predominate over any questions affecting only individual class members. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Prosecution as a class action will eliminate the possibility of repetitious litigation.

280.   Treatment of this case as a class action will permit many similarly situated persons, organizations, and businesses to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of relatively small claims by many class members who otherwise could not afford to litigate an antitrust claim such as that

124

asserted in this Complaint. No class representative is aware of any difficulties that would render this case unmanageable.

281.  Plaintiffs and their corresponding classes have all suffered, and will continue to suffer, antitrust injury and damages because of Varsity's exclusionary scheme and monopoly power in the relevant markets.

282.  Plaintiffs are not suing as part of this case, on behalf of themselves or any proposed class member, to enforce any rights or provisions in its Varsity contracts. Similarly, no Plaintiff in this matter claims, as part of this case, on behalf of itself or any proposed class member, that its Varsity contract(s), standing alone, violate the antitrust laws. Rather, Plaintiffs allege that Varsity contracts taken together form part of Varsity's exclusionary scheme and monopolistic enterprise to impair actual or potential rivals and enhance its monopoly power in the relevant markets. Cumulatively, the exclusionary scheme and monopolistic enterprise deprived Varsity's would-be rivals of access to critical inputs and to customers in the relevant markets, and thereby

foreclosed competition, and caused anticompetitive effects in the relevant markets.

## VIII. JURY TRIAL DEMANDED

283.  Pursuant to Fed. R. Civ. P. 38(c), Plaintiff demands a trial by jury on all issues so triable.

## IX.   PRAYER

284.  WHEREFORE, Plaintiffs on behalf of themselves and the proposed classes respectfully ask the Court for a judgment that:

A.   Certifies an Independent Event Production Class pursuant to Fed. R. Civ. P. 23(a), 23(b)(2) and (b)(3) and appoints David Owens with Rockstar Championships, LLC and his undersigned attorneys as class representative and class counsel, respectively.  In the event that this Court should deny class certification of this class, then, in that event, David Owens with Rockstar Championships, LLC wishes to remain as an individual Plaintiff in pursuit of its individual losses for the reasons asserted herein above.

126

B.    Certifies a Competitive, Recreational, College, High School or Junior High School Student Parent Class pursuant to Fed. R. Civ. P. 23(a), 23(b)(2) and (b)(3) and appoints Ashley Haygood, Mark & Kathleen Lukens and their undersigned attorneys as class representative and class counsel, respectively.

C.    Certifies an Apparel, Athletic Equipment and Merchandise Class pursuant to Fed. R. Civ. P. 23(a), 23(b)(2) and (b)(3) and appoints Heidi Weber with American Spirit and Cheer Essentials, Inc., and her undersigned attorneys as class representative and class counsel, respectively.  In the event that this Court should deny class certification of this class, then, in that event, Heidi Weber with American Spirit and Cheer Essentials, Inc. wishes to remain as an individual Plaintiff in pursuit of its individual losses for the reasons asserted herein above.

D.    Certifies a Cheer Camp Market Class pursuant to Fed. R. Civ. P. 23(a), 23(b)(2) and (b)(3) and appoints Craig Hallmark with Jeff & Craig Cheer, LLC, d/b/a Jeff and Craig Camps and their undersigned attorneys as class representatives and class counsel, respectively.  In the event that this Court should deny class certification of this class,

127

then, in that event, Craig Hallmark with Jeff & Craig Cheer, LLC, d/b/a Jeff and Craig Camps wishes to remain as an individual Plaintiff in pursuit of its individual losses for the reasons asserted herein above.

E.   Finds

　　1.   Plaintiffs are more than adequate representatives of their classes, and their chosen class counsel [the undersigned] are more than adequate attorneys.

　　2.   Plaintiffs have the incentive, and are committed to prosecuting this action, for the benefit of their respective class.

　　3.   Plaintiffs have no interests that are antagonistic to those of the classes; and

　　4.   Plaintiffs have retained counsel experienced in antitrust and class action litigation.

F.   Awards Plaintiffs and their Classes treble the amount of damages Defendants caused pursuant to 15 U.S.C. § 15(a), and 18 U.S.C. §§ 1961 et seq.;

G.   Awards Plaintiffs and their Classes the cost of this lawsuit pursuant to 15 U.S.C. § 15(a).

H.   Awards Plaintiffs and their Classes Attorney's fees pursuant to 15 U.S.C. § 15(a).

128

I.      Awards Plaintiffs and their Classes simple interest on actual damages pursuant to 15 U.S.C. § 15(a) for the period beginning on the date of service of this pleading and ending on the date of judgment but only if Defendants unnecessarily delay resolution of this action.

J.      Orders such equitable and injunctive relief as is necessary to correct for the anticompetitive market effects caused by Defendants' unlawful conduct.

K.      Enters judgment against Defendants, holding them jointly and severally liable for the antitrust violations alleged herein.

L.      Directs such further relief as it may deem right and just; and

M.      Orders Plaintiffs be entitled to a trial by jury.

Respectfully submitted,

*/s/  Robert A Falanga*
Robert A. Falanga, Esq.
Georgia Bar No. 254400

*/s/  Kobelah Svensen Bennah*
Kobelah Svensen Bennah
Georgia Bar No. 378113

129

1

2

3

4

5

6

7

8

9

10

LAW OFFICES
FALANGA & CHALKER
11200 Atlantis Pl #C
Alpharetta, GA 30022
Phone: (770) 955-0006
Fax: (770) 955-2123
Robert@FalangaLaw.com
 kobelah@falangalaw.com

130

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

AMERICAN SPIRIT AND CHEER
ESSENTIALS, INC. by HEIDI WEBER,
ROCKSTAR CHAMPIONSHIPS, LLC
by DAVID OWENS, JEFF & CRAIG
CHEER, LLC, d/b/a JEFF AND CRAIG
CAMPS, by CRAIG HALLMARK,
MARK LUKENS and KATHLEEN
LUKENS, and ASHLEY HAYGOOD,
Individually and on Behalf of all Others
Similarly Situated,

                    Plaintiffs,

v.

VARSITY BRANDS, LLC, BSN
SPORTS, LLC, VARSITY SPIRIT LLC,
HERFF JONES, LLC, VARSITY
BRANDS HOLDING CO., INC.,
VARSITY SPIRIT FASHION &
SUPPLIES, LLC, U.S. ALL STAR
FEDERATION, INC., USA
FEDERATION FOR SPORT
CHEERING, d/b/a USA CHEER,
VARSITY INTROPA TOURS, LLC and
JEFF WEBB,

                    Defendants.

CIVIL ACTION
FILE NUMBER:
 2:20-CV-02782-SHL-tmp


**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing:

    **(1)**    **PLAINTIFFS FIRST AMENDED COMPLAINT**

with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

131

Adam S. Baldridge
Nicole D. Berkowitz
Grady M. Garrison
Matthew Sinon Mulqueen
BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, P.C.
165 Madison Avenue, Suite 2000
Memphis, TN 38103


Edward L. Stanton, III
BUTLER SNOW LLP
6075 Poplar Avenue
Suite 500
Memphis, TN 3119


George Cary
Steven J. Kaiser
CLEARY GOTTLIEB STEEN & HAMILTON LLP
2112 Pennsylvania Avenue, NW
Washington, DC 20037
Paul Edward Coggins
Brendon Patrick Gaffney
LOCKE LORD LLP
2200 Ross Avenue, Suite 2800
Dallas, TX 75201


Respectfully submitted,

This 13th day of April, 2022.


 s/  Robert A Falanga
Robert A. Falanga, Esq.

Attorney Bar No. 254400

132

Interim Lead Class Counsel for Plaintiffs and their Putative Classes


s/ Kobelah Svensen Bennah
Kobelah Svensen Bennah

Attorney Bar No. 378113
Co-Counsel for Plaintiffs and their Putative Classes

LAW OFFICES
FALANGA & CHALKER
11200 Atlantis Pl #C
Alpharetta, GA 30022
Phone: (770) 955-0006
Fax: (770) 955-2123
robert@falangalaw.com
kobelah@falangalaw.com

133